HARRY FOX AGENCY, INC., Plaintiff,

v.

MILLS MUSIC, INC.,
Defendant-Appellee,

and

Marie Snyder and Ted Snyder, Jr. d/b/a
Ted Snyder Music Publishing Co.,
Defendants-Appellants.

No. 1105, Docket 83–7009.

United States Court of Appeals,
Second Circuit.

Argued May 9, 1983.

Decided Oct. 18, 1983.

Certiorari Granted March 26, 1984.
See 104 S.Ct. 1676.

Harold R. Tyler, Jr., New York City (Frederick T. Davis, Robert P. LoBue, Patterson, Belknap, Webb & Tyler, New York City, of counsel), for defendant-appellant Snyder.

Marvin E. Frankel, New York City (Michael S. Oberman, Steven E. Greenbaum, Kramer, Levin, Nessen, Kamin & Frankel, New York City, of counsel), for defendant-appellee Mills Music, Inc.

Melville B. Nimmer, Los Angeles, Cal. (Sidley & Austin, Los Angeles, Cal., of counsel), for amicus curiae National Music Publishers Ass'n.

Irwin Karp, Port Chester, N.Y., for amicus curiae Authors League of America, Inc.

Before OAKES, CARDAMONE and PIERCE, Circuit Judges.

OAKES, Circuit Judge:

This appeal presents a novel question of considerable importance concerning the meaning and application of the "derivative works exception" to the termination-of-transfers provision of the Copyright Act of 1976, 17 U.S.C. § 304(c)(6) (1977). At stake is whether the heirs of the composer of a song, or instead a music publishing company, are entitled to mechanical royalties from certain derivative works, in this case phonograph records. The heirs, exercising their rights under the Act, had terminated a grant to a music publishing company of all rights in the extended renewal term of the copyright of the song. This appeal concerns the rights to the mechanical royalties from phonograph records prepared and licensed before the termination of the renewal term grant to the publisher, but sold after the termination.

The case involves no dispute in facts and was quite properly disposed of in its entirety upon cross-motions for summary judgment. Ruling on the motions, the United States District Court for the Southern District of New York, Edward Weinfeld, Judge, in a characteristically thorough opinion held that the "derivative works" exception to the 1976 Act's author/composer termination rights, 17 U.S.C. § 304(c)(6)(A) (the "Exception"), operates to preserve the music publisher's rights to share song royalties from derivative works in the form of sound recordings licensed by it and prepared by sound recording companies before termination of the original grant by the author's heirs. *Harry Fox Agency, Inc. v. Mills Music, Inc.*, 543 F.Supp. 844 (S.D.N.Y. 1982). In a subsidiary holding the court held that under the Exception the music publisher could continue to license new releases of old derivative works that it first licensed prior to termination of the author's grant, with royalties to be shared as before, but that the publisher had no rights as to derivative works prepared after the termination or as to those prepared but not li-

censed prior to termination of the grant. *Id.*

Because we disagree with the basic premise of the opinion below, namely that Congress was addressing multiple-grant situations like that present in the instant case when it enacted the "derivative works" exception in the 1976 Act, we are required to reverse. Although the matter is one on which reasonable minds may well differ, we believe the scales tip in favor of the author's heirs, and that the music publisher/middleman, having already had the benefit of a renewal term, is without recourse upon termination.

*The nature of the case and the course of proceedings below.*

This interpleader action was brought by Harry Fox Agency, Inc. (Fox), to resolve a dispute between appellants Marie Snyder and Ted Snyder, Jr. (the Snyders), respectively the wife and son of the composer, Ted Snyder, and appellee Mills Music, Inc. (Mills or the publisher), concerning rights in the well-known song "Who's Sorry Now." Even though the amount in controversy in this case is relatively small, the overall issue involves substantial sums in future royalties in the music, literary, and movie worlds, among others.

"Who's Sorry Now" was written and composed in the early 1920s by Ted Snyder, Burt Kalmar, and Harry Ruby as equal one-third authors. Copyright for the initial twenty-eight year term was registered in the Copyright Office in 1923 and eventually assigned to Mills. Subsequently Snyder and his two co-authors by separate agreements assigned to Mills all their rights to the twenty-eight year renewal term of copyright under the Copyright Act of 1909, 35 Stat. 1075 as amended (repealed 1976), a procedure which the Supreme Court later held was permissible and enforceable. *Fred Fisher Music Co. v. M. Witmark & Sons,* 318 U.S. 643, 63 S.Ct. 773, 87 L.Ed. 1055 (1943). Under the terms of both the original agree-

ment and the renewal agreement, 50% of mechanical royalties received by Mills are retained by it and the other 50% are paid to the authors, a standard practice in the music publishing industry. These mechanical royalties are sufficiently substantial so that between July, 1971, and June, 1980, alone, $142,633.53 accrued in respect to this one song.

Fox, the interpleader plaintiff, as agent for Mills, issued licenses to record companies for mechanical recordings of the song, collecting from some 419 licensee record producers during the renewal period from 1951 to 1980. During the renewal term, after many, many years of consideration first by the Copyright Office and then by Congress, Congress adopted the 1976 Act which, inter alia, extended existing copyrights, including that in "Who's Sorry Now," by nineteen years, to a total of seventy-five years. 17 U.S.C. § 304(b). The Act provided that the author or specified successors may "terminate" previous grants and recapture all rights in the copyright for this nineteen year extension. *Id.* § 304(c). It expressly protected the authors and their heirs by providing that "termination of the grant may be effected notwithstanding any agreement to the contrary...." *Id.* § 304(c)(5). A proviso to the section, set out in the margin,[1] limits termination rights as regards the utilization of derivative works prepared under authority of the grant before its termination. *Id.* § 304(c)(6)(A).

On January 3, 1978, the appellants exercised their right to terminate at the beginning of the nineteen-year extension, i.e., effective January 3, 1980. As the district court held, the notice of termination was in proper form and operated to terminate Ted Snyder's grant to Mills of his one-third interest in the renewal copyright in the song, subject to applicability of the Exception. 543 F.Supp. at 848. Since the effective date of termination, Fox has collected me-

---

1. "A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based on the copyrighted work covered by the terminated grant." § 304(c)(6)(A).

chanical royalties from the record producers and deposited an amount equal to Snyder's share in court, for resolution as to whether Mills continues to have the right to receive 50% of the benefits or instead whether all the benefits now accrue to the song's authors, who have regained their copyright in the song.

*The statutory background.*

Since the original enactment in 1709 of the statute of 8 Anne, c. 19, which gave authors and their assigns an exclusive copyright for fourteen years from publication, and a renewal term for fourteen years conditional upon the authors' surviving the original term, the question of assignability of renewal rights has been a cause for litigation in the Anglo-American courts. The history of the litigation and the development of the relevant copyright law is fully set forth by Justice Frankfurter in *Fred Fisher Music Co. v. M. Witmark & Sons,* 318 U.S. at 647–56, 63 S.Ct. at 774–79. That history culminated in the decision in *Fisher* that under the Copyright Act of 1909, as amended, authors' rights to obtain renewal and extension of their copyrights are assignable by them through an agreement made before the expiration of the original copyright term. There, by a 5–3 majority, the Court upheld the 2–1 decision in this circuit, 125 F.2d 949 (2d Cir.1942), rejecting the view that the congressional purpose had been to reserve the renewal privilege for the personal benefit of authors and their families.

The Copyright Act of 1976, which took effect on January 1, 1978, made a number of significant changes relevant here. In general the 1976 Act increased authors' rights to profit from their own work by, inter alia, extending the length of copyright protection and by overruling *Fred Fisher Music Co.,* giving authors a chance to terminate grants of their renewal term rights. The Act was drafted and redrafted several times by the Copyright Office of the Library of Congress, which is a part of the legislative branch itself, 2 U.S.C. §§ 131–170 (Cum.Supp.1977). The draft went through a number of stages commencing with the Register's Report of July 1961 [2] and including numerous revisions as set forth in Copyright Law Revision Parts 1–6, as to which panel discussions with industry representatives were held and objections and suggested amendments made.[3] Ultimately the relevant provisions were presented to and enacted unchanged by Congress. Thus the principal expression of the drafter's intent is found in the twenty years of history before the bill came to Congress, although H.R.Rep. No. 1476 [4] and S.Rep. No. 473 [5] are useful, of course, as is the Conference Report on the Copyright Act of 1976.[6]

*The district court decision.*

Judge Weinfeld first noted that it is not disputed that the sound recordings of the song made by licensed record companies are "derivative works" covered by the "derivative works" exception. 543 F.Supp. at 849. This follows from the fact that the "sound recording" [7] constitutes a performance of a song first "fixed" on a master, *id.,* 17 U.S.C. § 101, and that the term "fixed" is synonymous with "prepared" in the statutory language of the Exception, "prepared under authority of the grant before termination."

---

**2.** Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law, 87th Cong., 1st Sess. Copyright Law Revision (H. Judiciary Comm. Print 1961) [hereinafter cited as Copyright Law Revision, Part 1].

**3.** The various revisions are referred to at *supra* note 2 and *infra* notes 11, 15, and 19.

**4.** House Judiciary Comm., Copyrights Act, H.R. Rep. No. 1476, 94th Cong., 2d Sess., *reprinted in* 1976 U.S.Code Cong. & Ad.News 5659 [hereinafter cited as H.R.Rep. No. 1476].

**5.** Senate Judiciary Comm., Copyright Law Revision, S.Rep. No. 473, 94th Cong., 1st Sess. (1975) [hereinafter cited as S.Rep. No. 473].

**6.** H.R.Rep. No. 1733, 94th Cong., 2d Sess., *reprinted in* 1976 U.S.Code Cong. & Ad.News 5810 [hereinafter cited as H.R.Rep. No. 1733]. The House Report is included as Appendix 4 in 4 M. Nimmer, The Law of Copyright (1983) [hereinafter cited as Nimmer] and the Conference Report is included as Appendix 5, *id.*

**7.** *See* 1 Nimmer, *supra* note 6, at § 2.10[A].

The Snyders argued that the recordings in question nevertheless did not fall within the scope of the Exception. First they argued that the Exception does not apply because the recordings were not prepared "under authority of the grant" from Snyder to Mills, as the Exception requires, but instead were prepared pursuant to the self-executing compulsory license provisions of the Copyright Act. Under the compulsory license provisions once the copyright owner has caused phono records to be distributed to the public, any other person may obtain a nonexclusive "compulsory license" to produce and distribute other versions of the same song by complying with the statutory notice, accounting, and payment requirements. 17 U.S.C. § 115. The court found that the record companies here did not comply with the statutory requirements. Instead, they obtained from Mills licenses which state that the record company is subject to the rights and obligations of users under the compulsory license provisions. These licenses, however, also specify modifications of the statutory terms, eliminating the notice requirement, reducing the frequency with which royalty payments and accountings have to be made according to statute, and reducing the statutory royalty rate. Judge Weinfeld's own *Joy Music, Inc. v. Seeco Records, Inc.,* 166 F.Supp. 549 (S.D. N.Y.1958), had held that, even where the parties have agreed to vary the exact terms of the compulsory license section but did not intend to waive its protection, the licenses were protected under that section, at least for purposes of maintaining federal jurisdiction. Nevertheless, he held below that *Joy* did not mean that these licenses were identical to pure compulsory licenses or that the licenses in this case were self-executing. 543 F.Supp. at 851. He concluded that Mills had authority to vary the statutory terms in these licenses by virtue of the grant from Snyder and his coauthors, so that all sound recordings prepared pursuant to such licenses were prepared under authority of the grants.

Having determined that the derivative works exception applied to the Snyder-Mills grant, the district court then held that Mills was entitled under the Exception to receive royalties earned after termination of the grant. 543 F.Supp. at 854. The court did this by interpreting the statutory language of the Exception, noting the distinction between derivative works "prepared under authority of the grant *before* its termination" and "other derivative works" prepared *after* termination. *Id.* at 853. Since the court had found that the sound recordings at issue are "derivative works prepared under authority of the grant," it concluded that

> under the clear language of the Exception, such sound recordings "may continue to be utilized under the terms of the grant after its termination" and, under the express terms of the Snyder grant, Mills is entitled to share equally with the Snyders all royalties from phono records made from those sound recordings.

543 F.Supp. at 854. The statutory term "grant" thus was held to refer to the grant from Snyder (and his fellow authors) to Mills, and not to have reference to the grant of a license from Mills to the record companies.

In this connection Judge Weinfeld rejected the Snyders' argument that the Exception does not affect the copyright of the underlying work but applies only to the "utilization" of derivative works. This would lead to the conclusion that the record companies alone retain the right to utilize the derivative works under the Exception and that the authors own the underlying copyright upon termination. Instead Judge Weinfeld argued that "because derivative works are substantially copied from an underlying work, utilization of a derivative work involves the copyright in the underlying work," 543 F.Supp. at 854. Therefore, "by allowing for the continued utilization of old derivative works, the Exception necessarily limits the reversion of those rights in the underlying work that are incident to this utilization of old derivative works." *Id.* The publisher's right to continue to receive royalties is a right "involved" with the utilization of the derivative works, and protected by the Exception.

The court further pointed out that nothing in the language of this section states that the Exception applies only to record companies and excludes music publishers, putting emphasis on the statutory phrase "terms of the grant" rather than on the term "utilize." The court rejected the argument that "under the terms of the grant" refers only to the relationship between the author and the record companies as owners of the derivative works and suggests that there is no such relationship. 543 F.Supp. at 854–55. In the court's view the Snyders' construction of the situation would nullify the grant from Snyder to Mills and, while the court conceded that "the Exception does not specifically address the situation herein where the author's grantee licenses others to make derivative works," its language is said to be entirely consistent with including Mills as Snyder's grantee. 543 F.Supp. at 855.

After discounting the legislative history as being "ambiguous," 543 F.Supp. at 855, Judge Weinfeld looked to the purposes underlying the Exception in the statutory scheme, *id.* at 857, and argued that "Congress intended that in specified situations the benefits of the extension be shared" as manifested by the Exception itself, which limits the reversion of rights to authors upon termination. It is with the conclusion drawn from this last point that we primarily disagree with Judge Weinfeld. In our view the congressional purpose has no reference to sharing by a middleman music publisher such as Mills. The judge then reviewed the legislative history and asserted that it "leaves no room to doubt" that the drafters of the termination provisions believed that the problem of unremunerative transfers and the need to afford authors an opportunity to share in the extended term would be "adequately addressed" by termination provisions which insure that authors can share in the benefits "but which also protect assignees." 543 F.Supp. at 860.

Finally, the district judge suggested that the policies underlying the copyright laws do not require exclusion of the music publisher in this situation, suggesting that the "sharing of returns provided to publishers" encourages publishers and other distributors to invest their resources in bringing creative works to the public, thereby contributing to the widest possible dissemination of works of authorship. 543 F.Supp. at 862.

*Discussion.*

We start with three propositions: first, that Mills is in reality relying on two separate grants; second, that Mills is not a utilizer of a derivative work; and, third, that the statute does not expressly address the situation here of a grant of rights to use the derivative work by the grantee of the author to a third party.

■ In connection with the first proposition, as copyright owner of the song by assignment from Snyder, Mills and Mills alone licensed the record companies, which obligated them to Mills alone. It is the terms of that grant or license which authorized each record company to prepare and utilize a derivative work, as indeed the district court held. While it is quite true, as the district court also held, that without the grant from Snyder to Mills enabling Mills to issue licenses to the record companies, "the licensees would be infringers," 543 F.Supp. at 850–51, it is also true that even with the Snyder grant to Mills, absent the grant *from* Mills, the licensees would be infringers.[8] In preparing the derivative works pursuant to the licenses, the licensees acted "under authority of the grant" from Mills to them even though that authority was derived from the original grant from Snyder to Mills.

Further proof of this first proposition lies in the fact that Mills itself relies on both grants. It relies on the terms of the Snyder-Mills grant for its right to retain 50% of the "net royalties actually received." But it equally relies on its own separate grants

---

8. This is so at least when, as here, the licensees did not comply with the compulsory license provisions of the Act.

to the record companies, which are the only grants authorizing preparation of the derivative works, specifying the amount and frequency of the payment and other conditions of utilization. The record companies were obligated by the grants running to them to pay 100% of the stipulated royalties to Mills. The record companies *cannot* utilize their sound recordings "under the terms of" the grant from Snyder to Mills alone, as that grant states no terms applicable to the record companies but refers only to the 50–50 division of the net royalties actually received. It is from the grant from Mills to the record companies that the latter have received the right to prepare derivative works and the privilege under the derivative works exception to continue to use the derivative work which they have prepared and created.

The district court held that the phrase in the Exception stating that a derivative work "may continue to be utilized under the terms of the grant" necessarily carries with it permission by the composer to the terminated grantee to use the underlying work.[9] This view in our opinion incorrectly assumes that the grant referred to is the Snyder-Mills grant. Since the only grants which have terms that define the circumstances under which derivative works are to be prepared and utilized are the Mills-record company grants, it is the terms of those grants that the Exception preserves, not the grant from the Snyders giving Mills 50% of the mechanical royalties.

█ Second, Mills Music is not a utilizer of a derivative work. The only derivative works in question are sound recordings owned by record companies whose rights are not at issue. All that Mills did was to utilize the underlying copyright when it owned it by licensing *others* to create and utilize derivative works. In fact, if Mills *did* attempt to "utilize" any of the derivative works itself, for example by selling copies of phono records of the copyrighted derivative work to the public, 17 U.S.C. § 106, it would be infringing upon the derivative copyrights, 17 U.S.C. § 103(a).

The language of the Exception supports such a conclusion. The Exception provides that the derivative work must be prepared under the authority of the grant, excluding, therefore, unauthorized derivative works. It is only grants from Mills to the record companies which authorize the preparation and creation of the derivative works here involved. The Exception, then, protects creators who utilize derivative works prepared under the authority of the grant authorizing the creation of such derivative works.

The district court argues that because a derivative user substantially copies from an underlying work, therefore a former holder of a copyright in the underlying work, like Mills, by definition must share in any exception or right given to the holder of a derivative copyright whose right to use the copyright originated from that former holder.[10] However, all this argument really demonstrates is that the music publisher is not in fact utilizing any derivative work, but rather once had a copyright (since terminated) that gave it, in the words of the district court, "rights in the underlying work that are *incident* to this utilization. . . ." 543 F.Supp. at 854 (emphasis added). The language of the Exception as understood by the district court would thereby be expanded to cover the publisher's asserted right to continue collecting royalties after termination even though the

9. 543 F.Supp. at 854; Brief for Appellant 14–15.

10. The district court correctly stated that "derivative works are substantially copied from an underlying work," and correctly concluded from this fact that "utilization of a derivative work involves the copyright in the underlying work," referring to a number of decisions to bolster its conclusion, 543 F.Supp. at 854 & n. 39. However, this conclusion and the cases supporting it are in our view irrelevant to the question at hand. The problem presented is not whether there is a relationship between an underlying copyright and a derivative copyright; the problem is in determining who it is that is "utilizing" the derivative work, as understood in the Exception. The Snyders concede that they in a sense lose some of their copyright rights as a result of the Exception. The question posed is to whom do they give up these rights—to the record companies alone or to the record companies and the middleman Mills?

statute quite explicitly protects from termination *only* continued utilization of derivative works, and not continued utilization of rights attached to the underlying work. In the name of literal construction, Mills and the district court in effect would write into the Exception a provision protecting certain rights in the underlying copyright from termination when in fact the statute does not cover them.

■ The third proposition on which we rely is that Congress did not specifically address the situation where the grantee from the author has himself subleased or subgranted or licensed use of the copyright. Nothing in the legislative history suggests that Congress did address it; [11] everything suggests that it did not, including especially the language of the Exception.[12] Had Congress wanted explicitly to address this situation, it could easily have drafted a clear proviso.[13]

Instead Congress left the derivative works exception essentially in the same lan-

---

11. The district court gave unjustified weight to a proposal in the pre-enactment hearings by the Authors League which the district court thought evidenced a construction in Mills' favor. 543 F.Supp. at 861 n. 80. The proposal was to condition continued use of "old derivative works" after termination on payment of a minimum of 5% of the transferee's gross receipts. *See* 1964 Revision Bill With Discussions and Comments, 89th Cong., 1st Sess., Copyright Law Revision, Part 5, 241–45 (H. Judiciary Comm. Print 1965) (Statement of the Authors League) [hereinafter cited as Copyright Law Revision, Part 5]. The court considered this to be an admission by the authors' interests that under the derivative works exception they would receive no additional benefits from their assignees' continued utilization of old derivative works after termination. But the proposal merely concerned the problem of lump sum grants to derivative users, in particular to motion picture companies.

The 1964 draft, like the promulgated Act, included the Exception which gives those who utilize derivative works the right to continue to do so under the terms of the old grant. The Authors League proposal, inter alia, unsuccessfully tried to alter this provision in the case of derivative owners who purchased their right to the underlying work outright in a lump sum. This part of the proposal did *not* address the problem of a middleman producer's rights to royalties under licenses given to, for example, record companies. Like much of the rest of the legislative history pointed to by both parties to this dispute, all this part of the Authors League proposal suggests is that the people involved in formulating the Exception did not consider the problem of the rights of the assignees of the underlying copyright to continue to receive royalties from owners of derivative copyrights.

Another related part of the Authors League proposal did address a problem of middleman publishers' rights under the termination clause, and led to the closing of a loophole in the Act which would otherwise have allowed publishers-assignees of nonexclusive rights in the underlying copyright to continue to exploit these rights after termination. *See* Copyright Law Revision, Part 5, *supra,* at 241. This proposal led to a change in sections 203 and 304 of the Act, giving owners the opportunity to terminate nonexclusive grants as well as exclusive grants. *Id.* at 224, 242; Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law, 1965 Revision Bill, 89th Cong., 1st Sess., Copyright Law Revision, Part 6, 73 (H. Judiciary Comm. Print 1965) [hereinafter cited as Supplementary Report]. However, we decline to place much weight on these changes, since they deprive publishers the right to profit from *new* derivative works after termination and are, once more, silent as to the problem we face concerning rights to royalties from derivative works produced *prior* to termination.

12. For example, the ambiguity surrounding the referents of the word "grant" in the Exception is made much of by both parties. In a two-party transaction the ambiguity dissolves: the author makes the grant to the derivative user who makes derivative works under the terms of the same grant and who is allowed to continue to utilize these works after the author has terminated the grant. Both parties struggle to show that the proviso, and especially the word "grant," has a plain meaning in the three-party transaction represented here. But clearly it does not, for the proviso speaks in terms of one grant, while here, as we have discussed, we are dealing with two distinct grants.

13. A proviso giving a publisher in Mills' situation the right to receive royalties could state something like the following:

A derivative work prepared under authority derived from the author's grant before its termination may continue to be utilized under the terms of the grant to the derivative work owner after its termination, with the terms of the grant from the author to control any sharing of proceeds derived from the derivative owner, but the privilege of the derivative work owner does not extend . . . .

Similarly, had Congress expressly intended to support the view of the Snyders, it could have

guage as it had been since 1965, and all indications are that it accepted the Exception because it wished to protect owners of derivative works like film producers who own derivative copyrights in books or plays. For example, the House of Representatives Report stated (in reference to section 203(b), the new copyright analogue to section 304):

> An important limitation on the rights of a copyright owner under a terminated grant is specified in section 203(b)(1). This clause provides that, notwithstanding a termination, a derivative work prepared earlier may "continue to be utilized" under the conditions of the terminated grant; the clause adds, however, that this privilege is not broad enough to permit the preparation of other derivative works. In other words, a film made from a play could continue to be licensed for performance after the motion picture contract had been terminated but any remake rights covered by the contract would be cut off. For this purpose, a motion picture would be considered as a "derivative work" with respect to every "preexisting work" incorporated in it,

whether the preexisting work was created independently or was prepared expressly for the motion picture.[14]

This explanation derived from the statement by former Register Barbara Ringer that the purpose of the clause was to "permit the owner of a derivative work, such as a motion picture, to continue using it" after termination of the grant of copyright in the underlying work.[15] Similarly, in 1967 a House Report[16] discussing the then-current Revision Bill (H.R. 2512), where the current holder of derivative rights was in effect granted a right of first negotiation as to possible extension of the relationship with the parties entitled to reversion upon termination, the Report states: "Grantees would be given the equivalent of a right of 'first refusal,' and *any grantee who has made a derivative work* under his grant can continue to use it even after termination."[17]

Judge Weinfeld held that "there is no indication that these statements were meant as limitations on the scope of the Exception" and that they are "ambiguous," in light of the consideration that the paradigm "grant" is from an author of a book or

---

said, as pointed out in the Brief for Appellee at 19 n. 14:
> An owner of the copyright in a derivative work prepared under authority of the grant before its termination may continue to use the derivative work despite termination under the terms of the grant, provided, however, that all royalties or other fees being paid by the owner of the derivative work for use of the underlying work shall, after termination, be paid only to the owner of the underlying copyright and none shall be paid to any intermediate grantee.

**14.** H.R.Rep. No. 1476, *supra* note 4, at 127, U.S.Code Cong. & Admin.News 1976, p. 5743.

**15.** Preliminary Draft for Revised U.S. Copyright Law and Discussions and Comments on the Draft, 88th Cong., 2d Sess. Copyright Law Revision, Part 3, 278 (H. Judiciary Comm. Print 1964). (Statement of Barbara Ringer, Register of Copyrights) [hereinafter cited as Copyright Law Revision, Part 3].

Ringer's other comments also all identify the "owners" of the derivative works as the class of people the Exception was created to protect. For example, in a panel discussion of the Preliminary Draft, she stated that the Exception was designed to "preserve the right of the own-

er of a derivative work to exploit it, notwithstanding the reversion." Further Discussions and Comments on Preliminary Draft for Revised U.S. Copyright Law, 88th Cong., 2d Sess., Copyright Law Revision, Part 4, 39 (H. Judiciary Comm. Print 1964) (Statement of Barbara Ringer, Register of Copyrights).

The reason for protecting derivative users, according to Ringer, is that "users, such as motion picture producers and book publishers (to name two of many), contribute a great deal themselves to the success of a work and assume considerable economic risks and losses which the author does not ...." Copyright Law Revision, Part 3, *supra*, at 277.

We give weight to Ringer's interpretations because they were adopted in the House Report cited above, and because "Barbara Ringer, the Register of Copyrights, more than any other single person, is responsible for the content of the new law...." 1 Nimmer, *supra* note 6, Preface to the 1978 Comprehensive Treatise Revision at vi.

**16.** House Judiciary Comm., Copyright Law Revision, H.R.Rep. No. 83, 90th Cong., 1st Sess. (1967).

**17.** *Id.* at 9 (emphasis added).

play to a movie producer. 543 F.Supp. at 857 n. 51. Yet the fact that Congress considered an exception to a rule solely in terms of one group of people—creators of derivative works—is certainly significant when a member of a different class—a former holder of the underlying copyright—seeks to place himself within the exception.

If the above three propositions are correct, we then have to examine the purposes of the derivative works exception to determine what result Congress would have intended, not having faced the more complex situation, typically found in the music business, of a grant to a music publisher followed by subsequent grants to licensees by the publisher to creators of derivative works. *United States v. Bacto-Unidisk,* 394 U.S. 784, 799, 89 S.Ct. 1410, 1418, 22 L.Ed.2d 726 (1969), *reh'g denied,* 395 U.S. 954, 89 S.Ct. 2013, 23 L.Ed.2d 473 (1969). To reach these conclusions, we must, as the Supreme Court has reminded us in *Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 639, 101 S.Ct. 2061, 2066, 68 L.Ed.2d 500 (1981), ascertain the "identity of the class for whose benefit the statute was enacted." *See also Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975).

On balance, as we intimated earlier, we hold that Congress would have intended to protect the owner of the derivative work, i.e., the recording company, and the author of the underlying work, but not the original assignee who did not create the derivative work. In short, it was authors, not publishers, who were the intended beneficiaries of the termination provisions.[18] And it was derivative works' owners, themselves creators, not publishers, who were the intended beneficiaries of the Exception. This conclusion is supported to some extent by a decision of this court which, though criticized in other respects, points to the equities which support the proprietor of the derivative

copyright. *Rohauer v. Killiam Shows, Inc.,* 551 F.2d 484 (2d Cir.), *cert. denied,* 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977). The court said:

> In contrast to the situation where an assignee or licensee has done nothing more than print, publicize and distribute a copyrighted story or novel, a person who with the consent of the author has created an opera or a motion picture film will often have made contributions literary, musical and economic, as great as or greater than the original author.

551 F.2d at 493. As for assignments or licenses of underlying copyright, "[i]n such cases there is not the countervailing consideration that large and independently copyrightable contributions will have been made by the transferee." *Id.* (relying upon the "policy considerations in §§ 203(b)(1) and 304(c)(6)(A)").

A motion picture company, for example, in the creation of a film based on a novel, combines the efforts of actors, director, cinematographers, scenic designers and other talents, scenery, costumes and other physical ingredients, often including the screenplay. Thus a book sold to a movie producer often involves the producer's investing millions of dollars to produce a film, as was pointed out during the Copyright Office revision hearings.[19] It was a motion picture attorney who proposed that the original termination proposal be modified so that "the motion picture producer could continue exploiting any motion pictures made during the 20-year period."[20] A record company is in the same position as the motion picture company in that it combines the talents of vocalists, musicians, arrangers, recording engineers, and so on to produce a sound recording of the composer's song. Having thus utilized the original elements of the underlying song, the recording company is permitted by the derivative works excep-

---

**18.** H.R.Rep. No. 1476, *supra* note 4, at 124, 140, *reprinted in* 1976 U.S.Code Cong. & Ad.News, at 5740, 5756–57. *See also Burroughs v. Metro-Goldwyn-Mayer, Inc.,* 683 F.2d 610, 617 (2d Cir.1982).

**19.** Discussions and Comments on Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law, 88th Cong., 1st Sess., Copyright Law Revision, Part 2, 105 (H. Judiciary Comm. Print 1963).

**20.** *Id.* at 265.

tion to continue to utilize its own derivative work.

Of course, the purpose of the termination clause was to permit authors to terminate transfers made so as to rectify "the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited." [21] Indeed, as we have pointed out, Congress invalidated any agreements executed by authors or their heirs before termination that transferred to others the rights that revert on termination, section 304(c)(6)(D), thereby overturning *Fred Fisher Music Co. v. M. Witmark & Sons,* 318 U.S. 643, 63 S.Ct. 773, 87 L.Ed. 1055 (1943). The contract between the creator and a middleman, made at a time when the value assignable to the work's future exploitation is at its most speculative, is precisely the kind of bargain to which the termination clause was addressed. A contract with an actual derivative user is that much less speculative; another factor suggesting that Congress, had it considered the question, would have limited the Exception to derivative users.

The district court suggested that Congress intended publishers and other non-creative middlemen to share in original derivative work royalties after termination. Congress, however, accommodated the interests of terminated assignees elsewhere. The original proposal that lump sum transfers to producers be terminated after twenty years [22] was not accepted and a twenty-five year term was proposed.[23] After further publisher objections, the Copyright Office extended the permissible term of assignments to thirty-five years.[24] This thirty-five-year term was subsequently settled upon as a compromise.[25] In the 1964 bill, section 16(b)(2)(B) also created a right of first negotiation between author and assignee for post-termination rights, surely a concession to publishers,[26] and in the case where publication occurs more than five years after the transfer of rights, the 1965 Revision bill extended the transfer to forty years.[27] Finally, the original scheme of automatic termination was amended to require an affirmative act by the author.[28] Thus, the interests of assignees not protected by the derivative works exception were acknowledged and protected by other devices.

Nor does our reading of the Act give authors a monopoly on the use of particular creative works. There are privileges of fair use, 17 U.S.C. § 107, and compulsory license provisions, 17 U.S.C. § 115. These limitations are imposed to vindicate the public interest in the need for access to information contained in copyrighted works and in the promotion of a multiplicity of voices in society.[29] The derivative works exception guarantees public access to derivative works, including sound recordings, by withholding from the owner of the underlying copyright after termination a veto power over continued utilization of these works. Thus, as we see it, the various purposes of Congress are met, and the interests of all accommodated, by the construction which we believe must be given to the Act.

In light of the foregoing, we have no reason to treat the supposed conflict created by the district court decision between the termination provisions and the compul-

**21.** H.R.Rep. No. 1476, *supra* note 4, at 124, *reprinted in* 1976 U.S.Code & Ad.News at 5740.

**22.** Copyright Law Revision, Part 1, *supra* note 2, at 94.

**23.** Copyright Law Revision, Part 3, *supra* note 15, at 15 (Preliminary Draft, § 16, Alt. A).

**24.** Copyright Law Revision, Part 5, *supra* note 11, at 10 (Section 16).

**25.** Supplementary Report, *supra* note 11, at 75.

**26.** Copyright Law Revision, Part 5, *supra* note 11, at 153–54.

**27.** Supplementary Report, *supra* note 11, at 74 (1965 Revision Bill § 203(a)(2)).

**28.** Copyright Law Revision, Part 5, *supra* note 11, at 10 (1964 Revision Bill § 16).

**29.** *See, e.g., Meeropol v. Nizer,* 560 F.2d 1061, 1068 (2d Cir.1977); *Rosemont Enterprises, Inc. v. Random House, Inc.,* 366 F.2d 303, 307 (2d Cir.1966); 2 Nimmer, *supra* note 6, § 804[c] at 8–5.

sory license provision argued by appellants in Part 3 of their brief.

The termination provision of the 1976 Act "mark[s] a break with a two-hundred year-old tradition that has identified copyright more closely with the publisher than with the author." [30]  By ruling as we do today we affirm this congressional purpose, while assuring that creators holding derivative copyrights retain the protection Congress gave them in the derivative works exception, and while recognizing the interests of the publishers and of the public as defined and balanced by Congress in the 1976 Copyright Act.

Judgment reversed.

---

**30.** Ringer, *First Thoughts on Copyright Act of* *1976,* 22 N.Y.L. Sch.L.Rev. 477, 490 (1977).