**FRED AHLERT MUSIC CORP.,** doing business as **Olde Clover Leaf Music, Plaintiff–Counter–Defendant–Appellee,**

v.

**WARNER/CHAPPELL MUSIC, INC., Defendant–Counter– Claimant–Appellant.**

**Docket No. 97–7705.**

United States Court of Appeals, Second Circuit.

Argued Jan. 8, 1998.

Decided July 14, 1998.

---

18

Robert C. Osterberg, Abelman, Frayne & Schwab, New York City, for Plaintiff–Counter-Defendant–Appellee.

Alan L. Shulman, Silverman, Shulman and Baker, P.C. (Scott L. Baker, Jonathan J. Ross, on the brief), New York City, for Defendant–Counter-Claimant–Appellant.

Frederick F. Greenman, Deutsch, Klagsbrun & Blasband (Alvin Deutsch, Kay Murray, on the brief), New York City, for Amici Curiae The Songwriters Guild of America and The Authors Guild, Inc.

Before: VAN GRAAFEILAND, WALKER, Circuit Judges, and RAKOFF, District Judge.*

JOHN M. WALKER, Jr., Circuit Judge:

This appeal requires us to consider the scope of the "Derivative Works Exception" of the Copyright Act of 1976, 17 U.S.C. § 304(c)(6)(A). The Copyright Act of 1976 ("the 1976 Act") expanded the rights of authors and their heirs by automatically extending the life of their copyrights by 19 years, for a total of 75 years, see 17 U.S.C. §§ 304(a)-(b), and by allowing authors (or, if the authors are deceased, their statutory heirs) to terminate, for the period of the extended copyrights, any domestic copyright interests in their work that they may have granted to others, see 17 U.S.C. §§ 304(c)(1)-(3). The purpose of the termination provi-

---

sion is to protect the interests of authors, who may have bargained away their rights without a full appreciation of the value of their work, as well as the interests of authors' surviving spouses and children. *See Woods v. Bourne Co.*, 60 F.3d 978, 982 (2d Cir.1995); *Larry Spier, Inc. v. Bourne Co.*, 953 F.2d 774, 778–80 (2d Cir.1992). Thus, the 1976 Act creates a completely new property right in the copyright for 19 years, and allows the author and his or her heirs to exploit it. *See id.* at 779; H.R.Rep. No. 94–1476, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5756 (1976).

However, an author's termination rights are not unlimited. The 1976 Act's Derivative Works Exception permits a grantee or licensee who prepares a derivative work before termination to continue to utilize the derivative work during the extended renewal term "under the terms of the grant." 17 U.S.C. § 304(c)(6)(A). A derivative work is "a work based upon one or more preexisting works, such as a … sound recording…. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work.'" *Id.* at § 101. The Exception seeks to protect public access to the derivative work as well as the rights of persons who have invested in creating the derivative work. *See Woods*, 60 F.3d at 986; Donald A. Hughes, Jr., *Jurisprudential Vertigo: The Supreme Court's View of "Rear Window" is for the Birds*, 60 Miss. L.J. 239, 251–52 (1990).

In this action, both the appellee, Fred Ahlert Music Corp. ("Ahlert"), and the appellant, Warner/Chappell Music, Inc. ("Warner"), claim the right to license the use of a 1969 Joe Cocker recording, a derivative work based on the copyrighted musical composition "Bye Bye Blackbird" (the "Song"), in the soundtrack and soundtrack album of the motion picture "Sleepless in Seattle." Warner's predecessor in interest authorized preparation of the Cocker derivative pursuant to a

grant from the Song's co-authors, Mort Dixon and Ray Henderson.

The statutory heirs of Mort Dixon terminated, pursuant to the 1976 Act, the rights held by Warner in the Song that were attributable to Dixon; the termination was to be effective in 1982. Warner claims a continued right to royalties, however, on the basis that the inclusion of the Cocker derivative on the movie soundtrack and soundtrack album is a post-termination utilization of a derivative work within the meaning of the Derivative Works Exception. Ahlert, successor-in-interest to Dixon's heirs, argues that Warner has no rights pertaining to the use of the Cocker derivative on the "Sleepless in Seattle" soundtrack or on the soundtrack album because those uses were not authorized "under the terms of the grant," and thus do not fall within the Exception. We agree with Ahlert, and affirm.

## BACKGROUND

"Bye Bye Blackbird" was written by Mort Dixon and Ray Henderson, who registered their copyright in the Song on May 3, 1926. Under the Copyright Act of 1909, Pub.L. 60–349, 35 Stat. 1075 (1909) (previously codified at 17 U.S.C. §§ 1–216) (repealed 1976), the copyright in a musical composition was effective for 28 years and renewable for an additional 28 years by the author. *See Mills Music, Inc. v. Snyder*, 469 U.S. 153, 157, 105 S.Ct. 638, 83 L.Ed.2d 556 (1985). On May 6, 1953, the copyright was effectively renewed in the names of both authors; it was to have expired on December 31, 1982. Prior to renewal, each author assigned his interest in the copyright to Remick Music Corporation ("Remick"), the predecessor in interest to Warner. On March 23, 1956, Dixon died.

On or about May 2, 1969, Warner granted a non-exclusive mechanical license to A & M Records ("A & M").[1] This license authorized A & M to record and manufacture a phonorecording of the Song performed by

---

1. A mechanical license allows the licensee to use a song in the manufacture and sale of phonorecords. The Act defines phonorecords as "material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed …, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101. In contrast, a synchronization license authorizes the licensee to include a song in a motion picture in synchronism with the on-screen image.

recording artist Joe Cocker. The agreement "cover[ed] only the particular recording mentioned herein of said musical composition." That recording was identified in the agreement as "RECORD NO. SP 4182" by "RECORDING ARTIST Joe Cocker." Pursuant to this license, A & M produced a version of the Song performed by Joe Cocker (the "Cocker derivative").

In 1976, Congress enacted a sweeping revision of the Copyright laws. *See* Pub.L. No. 94–553, 90 Stat. 2541 (1976) (codified at 17 U.S.C. §§ 101–810); *see also Mills Music*, 469 U.S. at 159–62, 105 S.Ct. 638. Among these changes, the new 17 U.S.C. § 304(b) automatically extended the renewal term of the copyright for an additional 19 years, through December 31, 2001 (the "extended renewal term"), for a total copyright term of 75 years.[2] The 1976 Act also allowed the authors of copyrighted material (or if deceased, their statutory heirs) to terminate any grant of a transfer or license in a copyrighted work for the duration of the extended renewal term where the grant was executed before 1978. 17 U.S.C. § 304(c).[3] On January 3, 1978, pursuant to the 1976 Act, Dixon's statutory heirs Yvonne Dixon Cresci and Estelle Barbara Kalish served formal notice terminating Dixon's grant to Remick, effective May 3, 1982.[4] Thus, Warner's domestic rights in the Song reverted to Dixon's heirs. *See* 17 U.S.C. § 304(c)(6).[5] On February 24, 1986, Dixon's heirs signed an agreement transferring their interest in the Song to the plaintiff, music publisher Ahlert.

In 1992, Tri–Star Pictures, Inc. ("TriStar") sought permission from Ahlert to include the Song on the soundtrack of the motion picture "Sleepless in Seattle." Ahlert provided TriStar with a quote for use of the Song in the United States. Because Warner retained the foreign rights to the copyright after termination, Ahlert directed TriStar to seek a quote from Warner for foreign use of the Song. In May 1993, Warner issued a synchronization and performance license to TriStar specifying one background vocal usage of the Song (an edited version of the Cocker derivative) and five background instrumental uses (recorded specifically for the film) on the "Sleepless in Seattle" soundtrack. In June, 1993, Ahlert issued a synchronization and performance license to TriStar authorizing identical uses of the Song. Ahlert's license granted domestic rights to TriStar; Warner's license granted foreign rights. Ahlert claims that it awarded TriStar a synchronization license at a reduced rate in anticipation of the royalties Ahlert expected to receive as a result of the eventual release of a soundtrack album.

Subsequently, in July 1993, Ahlert, through its agent The Harry Fox Agency, Inc. ("Fox"), issued a mechanical license to TriStar's affiliate, Sony Music Entertainment, Inc. ("Sony"), for use of the Song, as embodied by the Cocker derivative, on the "Sleepless in Seattle" soundtrack album. On August 20, 1993, Warner wrote a letter to

**2.** Section 304(b) provides:

The duration of any copyright, the renewal term of which is subsisting at any time between December 31, 1976, and December 31, 1977, inclusive, or for which renewal registration is made between December 31, 1976, and December 31, 1977, inclusive, is extended to endure for a term of seventy-five years from the date copyright was originally secured.

**3.** Section 304(c) provides, in relevant part:

In the case of any copyright subsisting in either its first or renewal term on January 1, 1978 ... the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, ... is subject to termination under the following conditions:

...

(2) Where an author is dead, his or her termination interest is owned, and may be exer-

cised, by his widow or her widower and his or her children or grandchildren....

(3) Termination of the grant may be effected at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later.

**4.** The interests of Mr. Henderson are not the subject of this lawsuit; thus we analyze the rights of Ahlert and Warner as though Dixon were the sole author of the Song.

**5.** Section 304(c)(6) provides:

In the case of a grant executed by a person or persons other than the author, all rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to all of those entitled to terminate the grant....

Fox (which also represented Warner) asserting that "Warner Bros. Inc. retains all rights derived from uses of [the Cocker derivative], including mechanical royalties earned from uses of [the Song] on the ['Sleepless in Seattle'] soundtrack album." As a result of this letter, and despite Ahlert's protests, Fox canceled Ahlert's license to Sony, and instead issued a mechanical license to Sony on Warner's behalf. Since that time, Sony has paid royalties to Fox from sales of the "Sleepless in Seattle" soundtrack album, and in turn Fox has remitted these royalties to Warner.

On February 8, 1996, Ahlert brought this action in the United States District Court for the Southern District of New York (Harold Baer, Jr., *District Judge*). The complaint requested that the district court "declare and adjudge the following:"

A. The use of the Song in phonorecords made from the soundtrack of the motion picture SLEEPLESS IN SEATTLE is not a use of the Song within the Derivative Works Exception....

B. AHLERT, not WARNER, is entitled to license the use of the Song in the making and distributing of all phonorecords ... which reproduce the [Cocker derivative], and to receive all mechanical royalties attributable to the Dixon Share payable therefor, except phonorecords made and distributed by A & M Records, Inc. and identified as "Record No. SP 4182," the subject of the 1969 WARNER mechanical license to A & M Records.

C. WARNER shall account for, and pay to AHLERT, a sum equal to the amount of all mechanical royalties paid to WARNER for use of the Dixon Share in the Soundtrack Album, together with prejudgment interest....

D. AHLERT shall be granted such other and further relief as the court may deem to be just and proper.

Warner counterclaimed, seeking, *inter alia,* an accounting of all royalties that Ahlert received from granting TriStar the June, 1993, synchronization and performance license for the domestic right to use the Cocker derivative on the "Sleepless in Seattle" soundtrack.

Both parties moved for summary judgment. On April 14, 1997, the district court issued an order granting Ahlert's motion, denying Warner's motion, and dismissing Warner's counterclaims. *See Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.,* 958 F.Supp. 170 (S.D.N.Y.1997). The district court declared (1) that inclusion of the Song in the "Sleepless in Seattle" soundtrack and soundtrack album was not within the Exception, and (2) that Ahlert "is entitled to license ... the United States use of the" Song, as embodied by the Cocker derivative, during the extended renewal term, and "to receive 50% of all mechanical royalties ... payable for the use of the Song ... excluding phonorecords made and distributed by A & M Records and identified as 'Record No. SP 4182.'" Pursuant to this declaration, the district court ordered Warner (1) to pay Ahlert $118,781.06, constituting 50% of the mechanical royalties paid to Warner by Sony, and (2) to account for and pay to Ahlert 50% of all other mechanical royalties paid to Warner during the extended renewal term, except from the sale of "phonorecords made and distributed by A & M Records and identified as 'Record No. SP 4182.'" [6] The district court further awarded prejudgment interest to Ahlert. Warner appeals, challenging the district court's conclusion that the mechanical license it issued to Sony is not covered by the Derivative Works Exception, and arguing that the scope of the district court's judgment was overbroad.

## DISCUSSION

I. *Standard of Review*

We review *de novo* the district court's award of summary judgment, drawing all inferences and resolving all ambiguities in favor of the party opposing the motion. *See Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869 (2d Cir.1998).

II. *Derivative Works Exception*

As noted above, the Copyright Act of 1976 had a major effect on the rights of the par-

---

**6.** Recall that Ray Henderson's 50% interest in the Song is not at issue in this action.

ties to this dispute. Section 304(b) automatically extended the copyright renewal term for 19 years. Section 304(c) gave Dixon's heirs (to whose interests Ahlert has succeeded) the right to exploit this extended renewal term by allowing them to terminate Dixon's grant to Remick (Warner's predecessor in interest). Upon termination, all rights possessed by Remick and Warner reverted to Dixon's heirs, including the right to license uses of the Song and receive any consequent royalties. But there is one notable caveat—the Derivative Works Exception:

> A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

17 U.S.C. § 304(c)(6)(A).

The Derivative Works Exception reflects Congress's judgment that the owner of a derivative work should be allowed to continue to use the derivative work after termination, "both to encourage investment by derivative work proprietors and to assure that the public retain[s] access to the derivative work." Note, *The Errant Evolution of Termination of Transfer Rights and the Derivative Works Exception*, 48 Ohio St. L.J. 897, 912 (1987). Without the Exception, the creator of a derivative work (and, indeed, the public at large) could be held hostage to the potentially exorbitant demands of the owner of the copyright in the underlying work.

The parties to the present case do not dispute that the Cocker derivative is a "derivative work prepared under authority of the grant before its termination." Rather, they dispute whether the inclusion of the Cocker derivative on the soundtrack and soundtrack album constitutes "utiliz[ation] under the terms of the grant."[7] The district court found that it was not, and therefore concluded that Ahlert was entitled to receive the contested royalties. Warner appeals from this determination. In order to resolve

this question, we must determine what is meant by the phrase "the terms of the grant."

The Supreme Court interpreted the meaning of "the terms of the grant" in *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 105 S.Ct. 638, 83 L.Ed.2d 556 (1985). That case involved a controversy between a music publisher and the heirs of Ted Snyder, a co-author of the copyrighted musical composition "Who's Sorry Now." The original copyright was registered in 1923 by a publishing company partially owned by Snyder. When that company went bankrupt, the bankruptcy trustee assigned the copyright to music publisher Mills Music. In 1940, Mills Music and Snyder entered into an agreement whereby Snyder assigned his interest in all renewals of the copyright to Mills Music. In exchange, Mills Music agreed to pay certain royalties to Snyder, including 50 percent of all net royalties received for mechanical reproductions of "Who's Sorry Now."

In 1951, Mills Music registered the renewed copyright. It then issued over 400 licenses to record companies authorizing various recordings of "Who's Sorry Now." These record companies paid royalties to Mills Music, which in turn remitted 50 percent of those royalties to Snyder. On January 3, 1978, Snyder's heirs served notice of termination on Mills Music effective January 3, 1980, pursuant to the 1976 Act's termination provision. Mills Music claimed that after termination, Snyder's heirs were entitled to only 50 percent of the royalties from pre-termination derivative recordings of "Who's Sorry Now," as was agreed to in the original 1940 grant from Snyder to Mills Music. The heirs claimed that they were entitled to the full 100 percent of these royalties.

Resolution of the dispute turned on whether the "terms of the grant" preserved by the Exception included only the approximately 400 licenses from Mills Music to the record companies, or whether it also included the terms of the original 1940 grant from Snyder to Mills Music entitling the latter to 50% of the mechanical royalties. The Supreme

---

**7.** The parties also dispute whether or not the soundtrack and the soundtrack album represent new derivative works prepared after termination.

If they are, then the Derivative Works Exception does not apply. In light of our disposition of this case, we need not resolve this question.

Court first examined the text of the Derivative Works Exception. For convenience, we set forth this text a second time.

A derivative work prepared under authority of the *grant* before its termination may continue to be utilized under the terms of the *grant* after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated *grant.*

17 U.S.C. § 304(c)(6)(A) (emphasis added). Because the word "grant" appears three times in the Exception, the Court assumed that Congress intended to give the word the same meaning throughout. *Mills Music,* 469 U.S. at 164–65, 105 S.Ct. 638. Logically, the third reference to "the terminated grant" had to refer to Snyder's 1940 grant to Mills Music. *See id.* at 164, 105 S.Ct. 638. The Court next considered the first reference to the word "grant," in the phrase "derivative work[s] prepared under authority of the grant." Because "[t]he 1940 grant . . . expressly gave Mills the authority to license others to make derivative works," and because "each of the 400–odd sound recordings" at issue was authorized by Mills Music while it was owner of the copyright, the Court concluded that "whether the phrase . . . is read to encompass both the original grant to Mills and the subsequent licenses that Mills issued, or only the original grant, . . . the word 'grant' must refer to the 1940 grant from Snyder to Mills." *Id.* at 165, 105 S.Ct. 638.

Finally, the Court interpreted the phrase "under the terms of the grant." In order to give the word "grant" a consistent meaning throughout § 304(c)(6)(A), the Court reasoned that this language necessarily encompassed the original 1940 grant from Snyder to Mills Music. However, "the terms of the grant" for a particular derivative work also had to include the subsequent license between Mills Music and the record company

that prepared the derivative work. *See id.* at 165–66, 105 S.Ct. 638. Thus, the Court concluded that "the phrase 'under the terms of the grant' as applied to any particular licensee would necessarily encompass both the 1940 grant and the individual license executed pursuant thereto." *Id.* at 166–67, 105 S.Ct. 638 (quoting § 304(c)(6)(A)). In other words, the "terms of the grant" include the "entire set of documents that created and defined each licensee's right to prepare and distribute [the] derivative work[ ]," *id.* at 167, 105 S.Ct. 638, both the individual license requiring the licensee to pay royalties to Mills Music, and the 1940 grant from Snyder to Mills Music entitling the latter to keep 50 percent of those royalties and requiring it to remit the remaining 50 percent to Snyder's heirs.[8] Indeed, unless the preserved "terms of the grant" included the original grant from Snyder to Mills Music, the Court noted that "there would be neither a contractual nor a statutory basis for paying any part of the derivative-works royalties to the Snyders." *Id.* Therefore, the Court ruled that Mills Music was entitled to keep 50 percent of the disputed royalties. *See also Woods v. Bourne Co.,* 60 F.3d 978, 987 (2d Cir.1995) (interpreting *Mills Music* "to preserve during the post-termination period the panoply of contractual obligations that governed pre-termination uses of derivative works by derivative work owners or their licensees").

The Supreme Court in *Mills Music* did not specifically address the question before us: whether the author or the publisher has the authority to license new uses of a pre-termination derivative work after termination. When the *Mills Music* case was in the district court, Judge Weinfeld determined that after termination, the publisher retained the authority to license "new [uses] of old derivative works that it first licensed prior to termination of the [1940 grant] with royalties to be shared as [they were] before termination" (assuming of course that those new uses

---

8. In the present case, Warner argues that the terms of the license between Warner (the publisher) and A & M (the record company) would be relevant only if A & M's rights were at issue. This is incorrect. In *Mills Music,* the rights of the record companies that prepared the derivative works were not at issue. Yet, in determining

the relative rights of the author and the publisher, the Supreme Court looked at both the publisher-record company contract (which established the publisher's right to receive royalties from the record company) and the author-publisher contract (which established the right of the author to receive half of those royalties).

were not themselves new derivative works). *Harry Fox Agency, Inc. v. Mills Music, Inc.,* 543 F.Supp. 844, 868 (S.D.N.Y.1982), *rev'd,* 720 F.2d 733 (2d Cir.1983), *rev'd, Mills Music v. Snyder,* 469 U.S. 153, 105 S.Ct. 638, 83 L.Ed.2d 556 (1985). The district court reasoned that it would be illogical to impose a limitation on Mills Music's rights on the basis of licenses which Mills Music itself had issued and which were never a part of the original grant from Snyder to Mills Music. *Id.* Neither the Second Circuit Court of Appeals, which reversed the district court's judgment, nor the Supreme Court, which in turn reversed the Second Circuit, touched on the question of post-termination licensing of pre-termination derivative works.

We are not persuaded by the district court's reasoning in *Harry Fox Agency.* In effect, Judge Weinfeld's holding would enforce the terms of the original grant from the author to the music publisher but ignore the terms of the subsequent grant from the music publisher to the record company, at least when it came to authorizing post-termination uses of pre-termination derivative works. But, as the Supreme Court in *Mills Music* makes clear, the *"entire set of documents* that created and defined each licensee's right to prepare and distribute [the] derivative work[ ]" must be enforced. 469 U.S. at 167, 105 S.Ct. 638 (emphasis added). As one commentator has noted, "if the entire pretermination transaction is what is being preserved, then the limitations on the record companies are preserved as well, and any attempt to change them after termination is . . . outside of 'the terms of the grant.'" Howard B. Abrams, *Who's Sorry Now? Termination Rights and the Derivative Works Exception,* 62 U. Det. L.Rev. 182, 235 (1985) (quoting 17 U.S.C. § 304(c)(6)(A)); *see also* Howard B. Abrams, *The Law of Copyright* § 12.05[F][5][d][iv], at 12–50 (1998) (district court decision in *Harry Fox Agency* "seems to be in fundamental conflict with" the Supreme Court's *Mills Music* decision); *id.* at 12–58 ("[I]f a particular post-termination exploitation of the derivative work cannot be undertaken within the terms of the pre-termination grant, then it is the post-termination copyright owner who must authorize and be entitled to compensation for the par-

ticular post-termination exploitation of the copyright."). *But see* 3 Melville B. & David Nimmer, *Nimmer on Copyright* § 11.02[B], at 11–18.10 (1997) (concluding that new uses of a pre-termination derivative work "would not be the subject of termination because the post-termination licenses would simply constitute the further utilization of the previously prepared derivative work").

■ To determine, then, whether inclusion of the Cocker derivative on the "Sleepless in Seattle" soundtrack and soundtrack album is "under the terms of the grant," we must examine the scope of both the original grant from Dixon to Warner's predecessor in interest, and the subsequent grant from Warner to A & M authorizing production of the Cocker derivative. Although the original grant would presumably authorize this new use, plainly Warner's license to A & M does not. As the district court found, that license is a narrow one granting A & M the right to use "Bye Bye Blackbird" for the limited purpose of recording the Cocker derivative and releasing it as "Record No. SP 4182". This grant does not authorize any additional releases of the Cocker derivative, much less its inclusion on a movie soundtrack. Just as Warner continues to benefit from the terms of the second grant, pursuant to which it receives royalties from sales of the Cocker derivative on A & M Record No. SP 4182, it is bound by those terms of the second grant which limit its exploitation of the Song to sales of that phonorecord. *Cf. Mills Music,* 469 U.S. at 167 n. 35, 105 S.Ct. 638 (criticizing dissent for "read[ing] the 'terms of the grant' to include only those terms defining the amount of the royalty payments. . . . The statute itself . . . refers to 'the terms of the grant'—not to some of the terms of the grant.").

This result is consistent with the purposes of the Derivative Works Exception, which seeks to protect the rights of persons who have invested in creating the derivative work as well as to protect public access to derivative works. *See Woods,* 60 F.3d at 986; Hughes, *Jurisprudential Vertigo,* 60 Miss. L.J. at 251–52; Note, *Errant Evolution,* 48 Ohio St. L.J. at 912. Neither interest would be furthered if Warner, rather than Ahlert,

had the power to authorize new uses of the Cocker derivative. First, Warner's investment in the Cocker derivative is already protected because it may continue to receive its share of royalties from the sale of the A & M phonorecord. Second, ruling for Warner would not increase public access to the Cocker derivative. Any new use of the Cocker derivative would have to be specifically licensed, and there is no reason to believe Warner would authorize new uses more frequently than would Ahlert. *Cf. Woods*, 60 F.3d at 986 ("The goal of keeping derivative works in public circulation does not require that publishers rather than authors receive royalties for their use."). And of course, a ruling for Ahlert is more consistent with the general thrust of § 304, which is designed to protect the interests of authors and their heirs and to maximize their ability to exploit the value of their Songs during the extended renewal term. *See* Note, *Errant Evolution*, 48 Ohio St. L.J. at 912.

In sum, when Dixon's heirs terminated Warner's domestic copyright interest in the Song pursuant to 17 U.S.C. § 304(c), the right to authorize new uses of the Song as embodied by the Cocker derivative reverted to the heirs, because that right is not within the "terms of the grant" preserved by the Derivative Works Exception. The district court properly entered judgment in favor of Ahlert.

## III. *Scope of the District Court's Judgment*

Finally, Warner argues that the district court's judgment was too broad because it encompassed relief neither sought by Ahlert in the complaint nor litigated at trial. The district court ordered Warner to

account for and pay to [Ahlert] a sum equal to the amount of 50% of all other mechanical royalties paid to defendant for United States use of the Song in phonorecords first licensed and distributed during the extended renewal copyright term, ... excluding phonorecords made and distributed by A & M Records and identified as "Record No. SP 4182."

Warner claims that any award to Ahlert should have been limited to "the amount of all mechanical royalties paid to WARNER for use of the Dixon Share in the Soundtrack Album, together with prejudgment interest," as was requested in the complaint. We disagree.

█ In its prayer for relief, Ahlert asked the district court to "grant[ ] such other and further relief as the court may deem to be just and proper," invoking the district court's power, pursuant to 28 U.S.C. § 2202, to provide any "[f]urther necessary or proper relief based on a declaratory judgment or decree ... against any adverse party whose rights have been determined by such judgment." A district court may grant further relief, including monetary damages, whether or not it "ha[d] been demanded, or even proved, in the original action for declaratory relief." *Edward B. Marks Music Corp. v. Charles K. Harris Music Publ'g*, 255 F.2d 518, 522 (2d Cir.1958); *accord Insurance Servs. of Beaufort, Inc. v. Aetna Cas. and Sur. Co.*, 966 F.2d 847, 851–52 (4th Cir.1992); *Horn & Hardart Co. v. National Rail Passenger Corp.*, 843 F.2d 546, 548–49 (D.C.Cir.1988); *see also Beacon Constr. Co. v. Matco Elec. Co.*, 521 F.2d 392, 399–400 (2d Cir.1975) ("further relief" under § 2202 includes damages); *Alexander & Alexander, Inc. v. Van Impe*, 787 F.2d 163, 166 (3d Cir.1986); *Security Ins. Co. v. White*, 236 F.2d 215, 220 (10th Cir.1956).

█ The district court declared that Ahlert, rather than Warner, has the authority to license new uses of the Song, as embodied by the Cocker derivative, for the duration of the extended renewal term. The relief awarded by the district court followed directly from that declaration: because Ahlert is entitled to receive royalties from post-termination licenses, the judgment awarding those royalties to Ahlert was "proper relief based on a declaratory judgment." 28 U.S.C. § 2202. Although Warner argues that "recovery of some of the royalties the Court has awarded ... may independently be barred by the statute of limitations, laches, or other defenses," Appellant's Brief at 35, it nowhere indicates which royalties might be so barred, or what "other defenses" might bar relief. Furthermore, the record reveals no objection to the scope of relief by Warner in the district court. We will not vacate an award, other-

wise proper under § 2202, on the basis of unpreserved claims of theoretical error.

## CONCLUSION

The judgment of the district court is affirmed.