# MILLS MUSIC, INC. *v.* SNYDER ET AL.

No. 83–1153.   Argued October 9, 1984—Decided January 8, 1985

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, REHNQUIST, and O'CONNOR, JJ., joined. WHITE, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and BLACK-MUN, JJ., joined, *post*, p. 178.

*Marvin E. Frankel* argued the cause for petitioner. With him on the briefs was *Michael S. Oberman.*

*Harold R. Tyler, Jr.*, argued the cause for respondents. With him on the brief was *Frederick T. Davis.*

JUSTICE STEVENS delivered the opinion of the Court.

This is a controversy between a publisher, Mills Music, Inc. (Mills), and the heirs of an author, Ted Snyder (Snyder), over the division of royalty income that the sound recordings

of the copyrighted song "Who's Sorry Now" (the Song) have generated. The controversy is a direct outgrowth of the general revision of copyright law that Congress enacted in 1976.[1] The 1976 Act gave Snyder's heirs a statutory right to reacquire the copyright[2] that Snyder had previously granted to Mills; however, it also provided that a "derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination."[3] The sound recordings of the Song, which have generated the royalty income in dispute, are derivative works of that kind.[4] Thus, the dispute raises the question

---

[1] See 17 U. S. C. §§ 101–810. The 1976 Act generally became effective on January 1, 1978.

[2] 17 U. S. C. § 304(c)(2).

[3] § 304(c)(6)(A). The full text of this provision is quoted in n. 5, *infra*.

[4] The 1976 Act defines a "derivative work" as follows:

"A 'derivative work' is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work.'" 17 U. S. C. § 101.

A sound recording is generally fixed on a master, and then embodied and distributed on phonorecords. The 1976 Act distinguishes "sound recordings" from "phonorecords." The former are defined as follows:

"'Sound recordings' are works that result from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work, regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied." *Ibid.*

In contrast, the 1976 Act provides the following definition of "phonorecords":

"'Phonorecords' are material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with

whether an author's termination of a publisher's interest in a copyright also terminates the publisher's contractual right to share in the royalties on such derivative works.

The key that will unlock this statutory puzzle is an understanding of the phrase "under the terms of the grant" as it is used in § 304(c)(6)(A)—the so-called "derivative works exception" (the Exception) to the "termination of transfer and licenses" provisions found in § 304(c).[5] Before focusing on the meaning of the key phrase, we shall describe the chain of title to the copyright, the circumstances surrounding Congress' adoption of the 1976 Act, and how the pertinent provisions of the 1976 Act affected the relationship among the interested parties in 1978 when Snyder's heirs terminated the grant to Mills. We begin with the early factual history.

## I

Snyder was one of three persons who collaborated in creating "Who's Sorry Now."[6] Although Snyder actually held only a one-third interest in the Song, the parties agree that we should treat the case as if Snyder were the sole author. The original copyright on the Song was registered in 1923 in the name of Waterson, Berlin & Snyder Co., a publishing company that Snyder partly owned.[7] That company

---

the aid of a machine or device. The term 'phonorecords' includes the material object in which the sounds are first fixed." *Ibid.*

Moreover, "[a] work is 'fixed' in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." *Ibid.*

[5] The Exception reads as follows:

"A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant." 17 U. S. C. § 304(c)(6)(A).

[6] Snyder composed the music, and Burt Kalmar and Harry Ruby wrote the words. App. 52.

[7] *Id.*, at 49.

went into bankruptcy in 1929, and in 1932 the trustee in bankruptcy assigned the copyright to Mills.[8]

Under the Copyright Act of 1909, 35 Stat. 1075, the copyright in a musical composition lasted for 28 years from the date of its first publication, and the author could renew the copyright for an additional term of 28 years.[9]   Although Mills had acquired ownership of the original copyright from the trustee in bankruptcy, it needed the cooperation of Snyder in order to acquire an interest in the 28-year renewal term.   Accordingly, in 1940 Mills and Snyder entered into a written agreement defining their respective rights in the renewal of the copyright.   In essence, Snyder assigned his entire interest in all renewals of the copyright to Mills in exchange for an advance royalty and Mills' commitment to pay a cash royalty on sheet music and 50 percent of all net royalties that Mills received for mechanical reproductions.[10]

---

[8] *Id.*, at 38.

[9] The renewal application had to be filed before the expiration of the original term.   If the author predeceased the last year of the first 28-year term, certain statutory successors could accomplish renewal.   17 U. S. C. § 24 (1976 ed.) (1909 Act); see also *Fred Fisher Music Co.* v. *M. Witmark & Sons*, 318 U. S. 643, 644 (1943).

[10] The agreement, which Snyder and respondent Marie Snyder signed, covered Snyder's entire catalog of songs.   It provided, in part:

"In part consideration hereof, I further covenant and agree promptly to apply for renewal copyrights on all of my compositions which from time to time may hereafter fall due and are now part of your [Mills'] catalogue, whether I was the sole author thereof or collaborated with others and which vest in me the right to make copyright applications on all such compositions as provided by the United States Copyright Act and in which I have any right, title and interest or control whatsoever, in whole or in part, and I further covenant and agree with you to stand seized and possessed of all such renewal copyrights and of all applications therefor, and of all rights in or to any such compositions for you and for your sole and exclusive benefit . . . .   I further agree that when such renewal copyrights are duly issued and obtained they shall automatically become vested in you as the sole owner thereof, and your successors and assigns.

"After first deducting all advance royalties heretofore paid as above provided for, and any other sums that may have been advanced to me under

Mills obtained and registered the renewal copyright in 1951. After filing the required statutory notice,[11] Mills directly, or through the Harry Fox Agency, Inc., issued over 400 licenses to record companies authorizing the use of the Song in specific reproductions on phonograph records. Using a variety of different artists and different musical arrangements, these record companies prepared separate "derivative works," each of which was independently copyrightable.[12] Because each of these derivative works was a mechanical reproduction of the Song that was prepared pursuant to a license that Mills had issued, the record companies were contractually obligated to pay royalties to Mills, and Mills, in turn, was contractually obligated to pay 50 percent of those royalties to Snyder.[13] Fox acted as an agent for Mills, performing the service of collecting royalties from the licensed record companies and, after deducting its charges, remitting the net receipts to Mills, which in turn remitted 50 percent of that income to Snyder. After Snyder's death, his

---

the terms of this agreement, the following royalties shall be payable to me during your customary semi-annual royalty period each year, as follows: three (3¢) cents per copy upon each and every regular pianoforte copy, and two (2¢) cents per copy for each orchestration sold, paid for and not returned by virtue of the rights herein acquired, and a sum equal to fifty (50%) per cent of all net royalties actually received by you for the mechanical reproduction of said musical compositions on player-piano rolls, phonograph records, disks or any other form of mechanical reproduction, for licenses issued under said renewal copyrights . . . ." App. 41–42.

This agreement, of course, predated this Court's decision in *Fred Fisher Music Co.* v. *M. Witmark & Sons, supra,* which held that the 1909 Act did not prevent an author from assigning his interest in the renewal copyright before he had secured it. *Id.,* at 657.

[11] See 17 U. S. C. § 1(e) (1976 ed.) (1909 Act). Mills filed the required notice with the Copyright Office in 1958. App. 52.

[12] 17 U. S. C. § 103(b); 17 U. S. C. § 7 (1976 ed.) (1909 Act). The record reveals separate licenses for renditions of the Song by artists such as Judy Garland and Liza Minnelli, and Nat King Cole. App. 22, 81.

[13] See n. 10, *supra.*

widow and his son succeeded to his interest in the arrangement with Mills.

## II

The massive work necessary for the general revision of the copyright law began in 1955, perhaps stimulated in part by this country's help in the development of, and subsequent membership in, the Universal Copyright Convention.[14] In that year, Congress approved several appropriations for the Copyright Office. The Copyright Office then began building the foundation for the general revision by authorizing a series of 34 studies on major issues of copyright law; these studies were published and included in the legislative history.[15] After issuing a report in 1961, the Copyright Office conducted numerous meetings with representatives of the many parties that the copyright law affected.[16] In 1963, the Copyright Office issued a preliminary draft revision bill, which contained the essence of the Exception before the Court today.[17] Additional discussions with interested parties

---

[14] House Judiciary Committee, Copyrights Act, H. R. Rep. No. 94–1476, p. 47 (1976). Several earlier copyright law revisions had failed "partly because of controversy among private interests over differences between the Berne Convention and the U. S. law." *Ibid.*

[15] See Studies Prepared for the Subcommittee on Patents, Trademarks, and Copyrights of the Senate Committee on the Judiciary, 86th Cong., 1st & 2d Sess., Copyright Law Revision (H. Judiciary Comm. Prints 1960–1961).

[16] H. R. Rep. No. 94–1476, *supra*, at 47. See Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law, 87th Cong., 1st Sess., Copyright Law Revision (H. Judiciary Comm. Print 1961); Discussion and Comments on Report of the Register of Copyrights on the General Revision of U. S. Copyright Law, 88th Cong., 1st Sess., Copyright Law Revision, Part 2 (H. Judiciary Comm. Print 1963).

[17] Preliminary Draft for Revised U. S. Copyright Law and Discussions and Comments on the Draft, 88th Cong., 2d Sess., Copyright Law Revision, Part 3, pp. 16 (Alternative A), 21 (H. Judiciary Comm. Print 1964). The twin citations here and elsewhere refer to the derivative-works exception that is now codified at § 304(c)(6)(A) and refer to a similar

followed.[18]   Two additional draft revision bills supervened,
both containing the Exception.[19]   Interested parties submit-
ted commentary following the 1964 draft revision bill.[20]

Congress began its lengthy hearings after the Copyright
Office submitted the 1965 draft revision bill.[21]   The hearings
on the 1965 bill occupied over three weeks during a 3-month
period and involved well over 100 witnesses.   Moreover, the
Copyright Office prepared a supplementary report to accom-
pany the 1965 draft revision bill.[22]   Although additional
hearings were held in subsequent sessions,[23] and revision
bills were submitted to Congress in each term for the next
10 years,[24] discussion over the termination provisions, and
the Exception, was essentially completed at this time.   Con-
gress enacted the termination provisions and the Exception

derivative-works exception that is now codified at 17 U. S. C. § 203(b)(1).
We have examined the development of both sections for purposes of this
opinion.

[18] See Further Discussions and Comments on Preliminary Draft for
Revised U. S. Copyright Law, 88th Cong., 2d Sess., Copyright Law
Revision, Part 4 (H. Judiciary Comm. Print 1964).

[19] See H. R. 11947, 88th Cong., 2d Sess., §§ 16(b)(1), 22(c)(3)(A) (1964)
(1964 draft revision bill); S. 3008, 88th Cong., 2d Sess., §§ 16(b)(1),
22(c)(3)(A) (1964) (1964 draft revision bill); H. R. 4347, 89th Cong., 1st &
2d Sess., §§ 203(b)(1), 304(c)(5)(A) (1965) (1965 draft revision bill); S. 1006,
89th Cong., 1st Sess., §§ 203(b)(1), 304(c)(5)(A) (1965) (1965 draft revision
bill).

[20] See 1964 Revision Bill with Discussions and Comments, 89th Cong.,
1st Sess., Copyright Law Revision, Part 5 (H. Judiciary Comm. Print
1965).

[21] Hearings on H. R. 4347, 5680, 6831, 6835 before Subcommittee No. 3
of the House Committee on the Judiciary, 89th Cong., 1st Sess. (1965);
Hearings on S. 1006 before the Subcommittee on Patents, Trademarks,
and Copyrights of the Senate Committee on the Judiciary, 89th Cong., 1st
& 2d Sess. (1965–1966).

[22] Supplementary Report of the Register of Copyrights on the General
Revision of the U. S. Copyright Law: 1965 Revision Bill, 89th Cong., 1st
Sess., Copyright Law Revision, Part 6 (H. Judiciary Comm. Print 1965).

[23] H. R. Rep. No. 94–1476, *supra*, at 48–50.

[24] *Ibid.*

in the 1976 Act in virtually the same form as they appeared in the 1965 draft revision bill.[25]

## III

Section 304 of the 1976 Act significantly affected the rights of Mills and the Snyders in three ways.   First, § 304(b) provided an automatic extension of the life of the copyright; instead of expiring in 1980 at the end of the second renewal period, the copyright on the Song will endure until 1999.[26]

Second, § 304(c) gave the widow and surviving son of Snyder a right to terminate the grant to Mills of rights in the renewal copyright.[27]   That termination could be effected at

---

[25] Compare, H. R. 4347, 89th Cong., 1st & 2d Sess., §§ 203, 304(c) (1965), with 17 U. S. C. §§ 203, 304(c).

[26] That section provides:
"The duration of any copyright, the renewal term of which is subsisting at any time between December 31, 1976, and December 31, 1977, inclusive, or for which renewal registration is made between December 31, 1976, and December 31, 1977, inclusive, is extended to endure for a term of seventy-five years from the date copyright was originally secured."

[27] Relevant portions of that section read as follows:
"In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated by the second proviso of subsection (a) of this section, otherwise than by will, is subject to termination under the following conditions:

.          .          .          .          .

"(2) Where an author is dead, his or her termination interest is owned, and may be exercised, by his widow or her widower and his or her children or grandchildren . . .

.          .          .          .          .

"(3) Termination of the grant may be effected at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later.

"(4) The termination shall be effected by serving an advance notice in writing upon the grantee or the grantee's successor in title.

.          .          .          .          .

any time during the 5-year period after January 1, 1978, by serving a written notice on Mills and recording a copy in the Copyright Office before it became effective.

Third, § 304(c)(6) provided that the termination would cause all rights "covered by the terminated grant" to revert to Snyder's widow and son. That reversion was, however, subject to an exception that permitted a previously prepared derivative work to continue to be utilized after the termination "under the terms of the grant."[28]

## IV

On January 3, 1978, the Snyders delivered a written notice of termination to Mills. The notice complied with § 304(c); it identified the Song and stated that the termination applied to the "[g]rant or transfer of copyright and the rights of copyright proprietor, including publication and recording rights." Additionally, the notice stated that it would become effective on January 3, 1980.[29] On August 11, 1980, the Snyders advised Fox that Mills' interest in the copyright had been terminated and demanded that the royalties on the derivative works be remitted to them. Fox placed the disputed funds in escrow and initiated an interpleader action in the United States District Court for the Southern District of New York. Mills and the Snyders appeared therein, agreed on the relevant facts, and filed cross-motions for summary judgment. The District Court entered judgment for Mills. *Harry Fox Agency, Inc.* v. *Mills Music, Inc.*, 543 F. Supp. 844 (1982).

In an exhaustive opinion, the District Court first held that the record companies' derivative works had been "prepared under authority of the grant" from Snyder to Mills. The

---

"(5) Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant."

[28] § 304(c)(6)(A).

[29] App. 54. The record identifies Belwin-Mills Publishing Corp. as the grantee whose rights were to be terminated; the parties make no distinction between this entity and "Mills." *Ibid.*

court then noted that the statute did not make "any distinction between grantees who themselves make or own derivative works and those who license others to do so." *Id.*, at 854. Accordingly, the court concluded that the terms of the various contracts that had been in effect prior to the termination governed the record companies' obligation to pay royalties and that under those arrangements Mills and the Snyders were each entitled to a 50 percent share in the net royalties. *Id.*, at 867–869.

Relying on three "propositions," the Court of Appeals for the Second Circuit reversed. *Harry Fox Agency, Inc.* v. *Mills Music, Inc.*, 720 F. 2d 733 (1983). First, it reasoned that Mills was relying on two separate grants—the 1940 grant from Snyder to Mills and the later grants by Mills to the record companies—but that the Exception preserved only the second set of grants. Because the Snyders' termination caused the ownership of the underlying copyright to revert to them, the court viewed that reversion as carrying with it Mills' right to collect the royalties payable under the grants to the record companies. *Id.*, at 738–740. Second, the court determined that § 304 was enacted for the benefit of authors and that the Exception was designed to protect "utilizers" of derivative works; because Mills as a publisher was neither an author nor a "utilizer," it was not a member of either class that § 304 was intended to benefit. *Id.*, at 739–740. Third, the Court of Appeals read the legislative history as indicating that Congress had not contemplated a situation in which the authority to prepare derivative works was derived from two successive grants rather than a single grant directly from an author to a "utilizer." *Id.*, at 740–741. The court felt that if Congress had confronted this situation, it would not have wanted "publishers and other noncreative middlemen to share in original derivative works royalties after termination." *Id.*, at 743.

Having granted Mills' petition for a writ of certiorari in order to resolve this important question of copyright law, 466 U. S. 903 (1984), we now reverse. We are not persuaded

that Congress intended to draw a distinction between authorizations to prepare derivative works that are based on a single direct grant and those that are based on successive grants. Rather, we believe the consequences of a termination that § 304 authorizes simply do not apply to derivative works that are protected by the Exception defined in § 304(c)(6)(A). The boundaries of that Exception are defined by reference to the scope of the privilege that had been authorized under the terminated grant and by reference to the time the derivative works were prepared. The derivative works involved in this case are unquestionably within those boundaries.

## V

In construing a federal statute it is appropriate to assume that the ordinary meaning of the language that Congress employed "accurately expresses the legislative purpose."[30] We therefore start with an examination of the statutory text.

The critical subparagraph—§ 304(c)(6)(A)—carves out an exception from the reversion of rights that takes place when an author exercises his right to termination. A single sentence that uses the word "grant" three times defines the scope of the Exception. It states:

> "A derivative work prepared under authority of the *grant* before its termination may continue to be utilized under the terms of the *grant* after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the *terminated grant*." 17 U. S. C. § 304(c)(6)(A) (emphasis supplied).

The third reference is to "the terminated grant" which, in this case, must refer to Snyder's grant to Mills in 1940. It is logical to assume that the same word has the same meaning

---

[30] *Park 'N Fly, Inc.* v. *Dollar Park and Fly, Inc., post,* at 194; see also *American Tobacco Co.* v. *Patterson,* 456 U. S. 63, 68 (1982).

when it is twice used earlier in the same sentence.[31]   The reference to a derivative work at the beginning of the Exception is to one that was prepared "under authority of the grant." Again, because Mills, or Fox as its agent, authorized the preparation of each of the 400-odd sound recordings while Mills was the owner of the copyright, each of those derivative works was unquestionably prepared "under authority of the grant."   The 1940 grant from Snyder to Mills expressly gave Mills the authority to license others to make derivative works.[32]   Thus, whether the phrase "under authority of the grant" is read to encompass both the original grant to Mills and the subsequent licenses that Mills issued, or only the original grant, it is inescapable that the word "grant" must refer to the 1940 grant from Snyder to Mills.[33]

The second use of the word "grant" is in the critical phrase that allows the record companies to continue to utilize previously prepared derivative works "under the terms of the grant after its termination."   To give the word a consistent meaning, we must again read it to encompass the original grant from Snyder to Mills, even though it is evident that the

---

[31] *Erlenbaugh* v. *United States*, 409 U. S. 239, 243 (1972) ("[A] legislative body generally uses a particular word with a consistent meaning in a given context").

[32] See n. 10, *supra*.   Of course, if a license that Mills issued to a record company had authorized the preparation of several derivative works, only one of which had been prepared at the time of the Snyders' termination, the remaining, unexercised portion of the licensee's authority would constitute a part of the "terminated grant."   In this case, however, each license that Mills issued apparently authorized the preparation of only one derivative work.   Thus, at the very least, the "terminated grant" encompassed Mills' authority to license the preparation of any additional derivative works.

[33] The word "grant" is also used repeatedly in the remainder of § 304. That section is too long to quote in full, but a reading of the entire section discloses that the term is consistently used in a way that must encompass the original grant by an author or his heirs.

relevant terms of the grant for a particular licensee must also include the specific terms of its license.

Although a consistent reading of the word "grant" in the text of § 304(c)(6)(A) encompasses the 1940 grant from Snyder to Mills, the Court of Appeals concluded that the Exception preserved nothing more than the grants from Mills to the record companies. As we have briefly noted earlier, the Court of Appeals rested its conclusion on three separate propositions, each of which merits discussion.

### The Two Separate Grants

The Court of Appeals based its conclusion that Mills could not prevail largely on its view that the grant from Snyder to Mills was entirely separate from subsequent "grants" by Mills to the record companies. It reasoned:

> "Since the only grants which have terms that define the circumstances under which derivative works are to be prepared and utilized are the Mills-record company grants, it is the terms of those grants that the Exception preserves, not the grant from the Snyders giving Mills 50% of the mechanical royalties." 720 F. 2d, at 739.

It is undisputed that the 1940 grant did not itself specify the terms that would apply to the use of any particular derivative work. The licenses that Mills, or its agent Fox, executed contain those terms. But if the underlying grant from Snyder to Mills in 1940 had not authorized those separate licenses, they would have been nullities. Moreover, if the licenses are examined separately from that earlier grant, they merely require that royalty payments be made to Mills or to Fox as the collection agent for Mills.[34] In terms, they do not provide for any payments at all to the Snyders. The source of the Snyders' entitlement to a 50 percent share in the royalty income is the 1940 grant. Thus, a fair construction of

---

[34] App. 22–27.

the phrase "under the terms of the grant" as applied to any particular licensee would necessarily encompass both the 1940 grant and the individual license executed pursuant thereto.

If the scope of the entire set of documents that created and defined each licensee's right to prepare and distribute derivative works is used to define the relevant "terms of the grant" for purposes of the Exception, those terms include Mills' right to obtain 100 percent of the net royalty income in the first instance and Mills' obligation thereafter to remit 50 percent of those revenues to the Snyders. If, as the Court of Appeals held, the Exception limits the relevant "terms of the grant" to those appearing in the individual licenses, two rather glaring incongruities would result. First, the word "grant" would have inconsistent meanings in the same sentence, and in fact, within the entirety of both § 304(c) and the remainder of § 304. Second, and of greater importance, there would be neither a contractual nor a statutory basis for paying *any* part of the derivative-works royalties to the Snyders.[35]

The licenses issued to the record companies are the source of their contractual obligation to pay royalties; viewed apart from the 1940 grant, those licenses confer no rights on the Snyders. Moreover, although the termination has caused the ownership of the copyright to revert to the Snyders, nothing in the statute gives them any right to acquire any contractual rights that the Exception preserves. The Snyders' status as owner of the copyright gives them no right to collect royalties by virtue of the Exception from users of previously authorized derivative works. Stating the same point

---

[35] It should be noted that JUSTICE WHITE's dissent does not adopt the Court of Appeals' reading of the Exception. He reads the "terms of the grant" to include only those terms defining the amount of the royalty payments and to exclude the terms identifying the parties to whom the royalty is payable. The statute itself, however, refers to *"the* terms of the grant"—not to *some* of the terms of the grant.

from the perspective of the licensees, it is clear that they have no direct contractual obligation to the new owner of the copyright. The licensees are merely contractually obligated to make payments of royalties under terms upon which they have agreed. The statutory transfer of ownership of the copyright cannot fairly be regarded as a statutory assignment of contractual rights.[36]

## *The "Utilizer" of a Derivative Work*

The second of the Court of Appeals' propositions stated that Mills is not the "utilizer" of a derivative work because "[a]ll that Mills did was to utilize the underlying copyright when it owned it by licensing *others* to create and utilize

---

[36] The District Court concluded that, absent the Mills' licenses to the record companies, the record companies would be infringers. *Harry Fox Agency, Inc.* v. *Mills Music, Inc.*, 543 F. Supp. 844, 850–851 (SDNY 1982). The Court of Appeals accepted this conclusion. 720 F. 2d, at 738, n. 8. Moreover, under the copyright law, both before and after the 1976 Act, the record companies had a statutory right to obtain self-executing compulsory licenses from Mills. See 17 U. S. C. § 115; 17 U. S. C. §§ 1(e), 101 (1976 ed.) (1909 Act). In the District Court, the Snyders contended that the Exception was wholly inapplicable because the record companies had statutory compulsory licenses and therefore their sound recordings had not been prepared "under authority of the grant" within the meaning of the 1976 Act. The District Court rejected this contention, 543 F. Supp., at 851–852, finding that either Mills or its agent, Fox, executed the licenses; therefore, the licenses were not self-executing. This contention was not renewed in either the Court of Appeals or in this Court. (The comment on the compulsory-license mechanism in the dissent, *post*, at 185, n. 12, is incorrect because it seems to assume that the case involves self-executing compulsory licenses.) Additionally, although the Snyders contended otherwise in the District Court, 543 F. Supp., at 850–851, they no longer challenge the proposition that Mills issued the pretermination licenses "under authority of the grant" within the meaning of the Act. It is the royalty income generated by these 400-odd derivative works prepared before the termination that is at issue in this case. Mills acknowledges that it may not authorize the preparation of any additional works and that its only claim to an interest in royalties is that preserved by the Exception.

derivative works." 720 F. 2d, at 739. Building on its erroneous first proposition, the court determined:

"The language of the Exception supports such a conclusion. The Exception provides that the derivative work must be prepared under the authority of the grant, excluding, therefore, unauthorized derivative works. It is only grants from Mills to the record companies which authorize the preparation and creation of the derivative works here involved. The Exception, then, protects creators who utilize derivative works prepared under the authority of the grant authorizing the creation of such derivative works." *Ibid.*

Although not expressly adopting the Court of Appeals' first proposition regarding "two grants," respondents expand on the court's second proposition, urging that the Exception protects only the utilization of derivative works after the underlying copyright has reverted to the author. Brief for Respondents 3–8.

The protection provided to those who utilize previously prepared derivative works is not, however, unlimited. The word "utilized" as written in the Exception cannot be separated from its context and read in isolation. It is expressly confined by "the terms of the grant." The contractual obligation to pay royalties survives the termination and identifies the parties to whom the payment must be made. If the Exception is narrowly read to exclude Mills from its coverage, thus protecting only the class of "utilizers" as the Snyders wish, the crucial link between the record companies and the Snyders will be missing, and the record companies will have no contractual obligation to pay royalties to the Snyders. If the statute is read to preserve the total contractual relationship, which entitled Mills to make duly authorized derivative works, the record companies continue to be bound by the terms of their licenses, including any terms requiring them to continue to pay royalties to Mills.

*Legislative History*

The Court of Appeals' third, and last, proposition stated that "Congress did not specifically address the situation where the grantee from the author has himself subleased or subgranted or licensed use of the copyright." 720 F. 2d, at 740. It considered the statutory text ambiguous because the statute "speaks in terms of one grant, while . . . we are dealing with two distinct grants." *Id.*, at 740, n. 12. Because the Court of Appeals' review of the legislative history did not disclose any specific consideration of the problem that this case presents, it further concluded that Congress had simply overlooked the possibility that a licensee's authority to prepare derivative works might depend on two separate grants. The Court of Appeals, therefore, predicated its construction of the Exception largely on its evaluation of the legislative purpose: to "protect owners of derivative works like film producers who own derivative copyrights in books or plays." *Id.*, at 741.

Unlike the Court of Appeals, we are persuaded that Congress was well aware of the prevalence of multiparty licensing arrangements in the music-publishing industry, as well as in other industries that the copyright law vitally affected, when it enacted the 1976 Act. There are many references in the legislative history to multiparty arrangements in the music industry, and to the importance of the role of music publishers in the marketing of copyrighted songs. These references dissipate the force of the argument that Congress did not expressly consider the precise multiparty dispute before the Court today.[37] Indeed, there is reason to believe

---

[37] See, *e. g.*, Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law, *supra* n. 16, at 33 ("In practice the authors of musical works generally assign their recording and other rights to publishers, under an agreement for the division of royalties. In most instances the record companies secure licenses from the publishers, thereby avoiding some of the mechanics of notice and accounting required by the statute for exercise of the compulsory license"); H. Henn, The Compulsory License Provisions of the U. S. Copyright Law, Copyright Law Revision,

that the 50 percent arrangement between Snyder and Mills
that was made in 1940 was a typical example of the form of
copyright grant that had been prevalent in this industry for

Studies Prepared for the Subcommittee on Patents, Trademarks, and
Copyrights of the Senate Committee on the Judiciary, Study No. 5, 86th
Cong., 1st Sess., 47 (H. Judiciary Comm. Print 1960) ("[T]he general prac-
tice is for the composer to assign his common-law copyright to a music
publisher") (footnote omitted); A. Kaminstein, Divisibility of Copyrights,
Copyright Law Revision, Studies Prepared for the Subcommittee on
Patents, Trademarks, and Copyrights of the Senate Committee on the
Judiciary, Study No. 11, 86th Cong., 2d Sess., 23 (H. Judiciary Comm.
Print 1960) ("[I]n the music industry, the prevailing custom is that statu-
tory copyright in sheet music is secured in the name of the publisher");
Copyright Law Revision: Hearings on H. R. 4347, H. R. 5680, H. R. 6831,
H. R. 6835, *supra* n. 21, at 680 ("Copyrights almost invariably are owned
by publishers, whose contracts with songwriters customarily provide for
an equal division of royalties received from the exploitation of mechanical
reproduction rights. Attempts occasionally are made to create the image
of a large record company dealing with an innocent composer, but this is
pure myth; the composer turns his manuscript over to a publisher and the
latter is the copyright proprietor from which the record company must get
its rights") (footnote omitted) (statement of Record Industry Association of
America, Inc.); *id.*, at 1743–1744 (statement of Robert R. Nathan, Music
Publishers Protective Association, Inc.); cf. Copyright Law Revision:
Hearings on H. R. 2223 before the Subcommittee on Courts, Civil Liber-
ties, and the Administration of Justice of the House Committee on the
Judiciary, 94th Cong., 1st Sess., 1369 (1975) ("There are several distinct
groups of people who are involved in bringing about recorded music.
There is the composer of the music, there is the publisher, there is the art-
ist who records the music, and there is the record company that produces
and distributes the record") (testimony of Vincent T. Wasilewski, Presi-
dent, National Association of Broadcasters); *id.*, at 1651–1653 (letter of
Leonard Feist, National Music Publishers' Association, Inc.); *id.*, at 1653
("I feel that the argument is not with the publisher because when I went
into New York last year to compose the music for 'A Chorus Line.' I did it
with a new writer by the name of Ed Kleban. He is not a proven writer
yet. He has been subsidized for the last few years, been given money by a
publishing company to actually be able to live and to be allowed to write.
I think that for every instance where a publisher, say, is a person who does
not help, I think that there are a vast amount of people who can tell you
that there are people getting paid without yet, you know, giving material,
just by having faith in an individual, and obviously, Ed Kleban now has

many years.[38]   Rather than assuming that Congress was un-
aware of a common practice in one of the industries that the
general revision of the copyright law, and the termination
provisions, most significantly affected, we think it more
probable that Congress saw no reason to draw a distinction
between a direct grant by an author to a party that produces
derivative works itself and a situation in which a middleman
is given authority to make subsequent grants to such produc-
ers.   For whether the problem is analyzed from the author's
point of view or that of the producer of derivative works, the
statutory purposes are equally well served in either case.

The principal purpose of the amendments in § 304 was to
provide added benefits to authors.   The extension of the
duration of existing copyrights to 75 years, the provision of
a longer term (the author's life plus 50 years) for new copy-
rights, and the concept of a termination right itself, were all
obviously intended to make the rewards for the creativity of
authors more substantial.   More particularly, the termina-
tion right was expressly intended to relieve authors of the
consequences of ill-advised and unremunerative grants that
had been made before the author had a fair opportunity to

---

proved that he is good, and the publisher has proved that it was worth the
investment.   I just want to make sure that you understand that the plight
of the composer is not up against the publisher because we have had great
success with dealings with publishers.   It is elsewhere where we seem to
get into trouble") (testimony of Marvin Hamlisch, composer).

[38] See, e. g., W. Blaisdell, Size of the Copyright Industries, Copyright
Law Revision, Studies Prepared for the Subcommittee on Patents, Trade-
marks, and Copyrights of the Senate Committee on the Judiciary, Study
No. 2, 86th Cong., 1st Sess., 49 (H. Judiciary Comm. Print 1960) ("Music
composers and lyricists usually assign all rights in their works, including
the right to claim copyright, to a music publisher, subject to the provisions
of the contract of assignment.   In general the contract provides that the
composer-lyricists are to receive not less than 50 percent of the gross
returns from the sales of the work in whatever form"); Copyright Law
Revision: Hearings on H. R. 4347, H. R. 5680, H. R. 6831, H. R. 6835,
supra n. 21, at 781, 844 ("[E]qual split of copyright license fees between
publishers and songwriters is based upon industry practice") (statement of
John Desmond Glover).

appreciate the true value of his work product.[39]    That general purpose is plainly defined in the legislative history and, indeed, is fairly inferable from the text of § 304 itself.

The Exception in § 304(c)(6)(A) was designed, however, to exclude a specific category of grants—even if they were manifestly unfair to the author—from that broad objective.   The purpose of the Exception was to "preserve the right of the owner of a derivative work to exploit it, notwithstanding the reversion."[40]    Therefore, even if a person acquired the right to exploit an already prepared derivative work by means of an unfavorable bargain with an author, that right was to be excluded from the bundle of rights that would revert to the author when he exercised his termination right.   The critical point in determining whether the right to continue utilizing a derivative work survives the termination of a transfer of a copyright is whether it was "prepared" before the termination.   Pretermination derivative works—those prepared under the authority of the terminated grant—may continue to be utilized under the terms of the terminated grant.   Derivative works prepared after the termination of the grant are not extended this exemption from the termination provisions.   It is a matter of indifference—as far as the reason for

---

[39] In explaining the comparable termination provision in § 203, the House Report states:

"A provision of this sort is needed because of the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited.   Section 203 reflects a practical compromise that will further the objectives of the copyright law while recognizing the problems and legitimate needs of all interests involved." H. R. Rep. No. 94–1476, at 124.

[40] Further Discussions and Comments on Preliminary Draft for Revised U. S. Copyright Law, *supra* n. 18, at 39 (statement of Barbara Ringer). The House Report that accompanied the 1976 Act, certainly persuasive legislative history, affirmatively supports this view.   Regarding § 203(b), § 304(c)'s counterpart, it stated: "This clause provides that, notwithstanding a termination, a derivative work prepared earlier may 'continue to be utilized' under the conditions of the terminated grant." H. R. Rep. No. 94–1476, at 127.

giving protection to derivative works is concerned—whether the authority to prepare the work had been received in a direct license from an author, or in a series of licenses and sublicenses. The scope of the duly authorized grant and the time the derivative work was prepared are what the statute makes relevant because these are the factors that determine which of the statute's two countervailing purposes should control.[41]

The obligation of an owner of a derivative work to pay royalties based on his use of the underlying copyright is not subject to renegotiation because the Exception protects it. The "terms of the grant" as existing at the time of termination govern the author's right to receive royalties; those terms are therefore excluded from the bundle of rights that the author may seek to resell unimpeded by any ill-advised prior commitment. The statutory distinction between the rights that revert to the author and those that do not revert is based on the character of the right—not on the form or the number of written instruments that gave the owner of the derivative work the authority to prepare it. Nothing in the legislative history or the language of the statute indicates that Congress intended the Exception to distinguish between two-party transactions and those involving multiple parties.

The example most frequently discussed in the legislative history concerning the Exception involved the sale of a copyrighted story to a motion picture producer.[42] The Court of

---

[41] The legislative history also indicates that Congress intended the termination provisions to produce an accommodation and a balancing among various interests. See *id.*, at 124, 140; Senate Committee on the Judiciary, Copyright Law Revision, S. Rep. No. 94–473, p. 108 (1975) (accompanying S. 22, 94th Cong., 1st Sess.).

[42] Regarding § 203(b), the House Report stated:

"[N]otwithstanding a termination, a derivative work prepared earlier may 'continue to be utilized' under the conditions of the terminated grant; the clause adds, however, that this privilege is not broad enough to permit the preparation of other derivative works. In other words, a film made from a play could continue to be licensed for performance after the motion picture

Appeals explained the need for the Exception as the interest in protecting the large investment that is required to produce a motion picture, and recognized that record companies similarly must also make a significant investment in compensating vocalists, musicians, arrangers, and recording engineers. Therefore, the court concluded that record companies are clearly within the class that the Exception protects. The court felt, however, that music publishers—as middlemen—were not similarly situated, but rather merely had an ownership interest in the copyright that reverted to the author upon termination. 720 F. 2d, at 742–743. As a matter of fact—or of judicial notice—we are in no position to evaluate the function that each music publisher actually performs in the marketing of each copyrighted song. But based on our reading of the statute and its legislative history,[43] in inter-

---

contract had been terminated but any remake rights covered by the contract would be cut off. For this purpose, a motion picture would be considered as a 'derivative work' with respect to every 'preexisting work' incorporated in it, whether the preexisting work was created independently or was prepared expressly for the motion picture." H. R. Rep. No. 94–1476, at 127.

See also Preliminary Draft for Revised U. S. Copyright Law and Discussions and Comments on the Draft, *supra* n. 17, at 278 (statement of Barbara Ringer, Register of Copyrights).

[43] The legislative history indicates the usual practice:

"Book authors usually contract with book publishers for the publication of their works, the publisher taking title to all rights in the work subject to the provisions of the contract. The author usually receives a royalty computed as a percentage of the price at which each book is sold or as a percentage of the total volume of sales." W. Blaisdell, Size of Copyright Industries, *supra* n. 38, at 48.

Later, the same study indicates:

"In motion picture production creative material from both storywriters and composers is used. Motion picture producers employ creative talent on an employee-for-hire basis and on a freelance basis. However, the business contracts for the writing and adaptation of story material between the Association of Motion Picture Producers and the Writers Guild of America provide almost exclusively for employees for hire and it is only in unusual

preting the Exception we find no reason to differentiate between a book publisher's license to a motion-picture producer and a music publisher's license to a record company. Neither publisher is the author of the underlying work. If, as the legislative history plainly discloses, the Exception limits the reversion right of an author who granted his copyright on an original story to a book publisher who in turn granted a license to a motion-picture producer, we can see no reason why the Exception should not also limit the right of a composer, like Snyder, who made such a grant to a music publisher, like Mills, that preceded a series of licenses to record companies.[44]

## VI

Finally, respondents argue that the legislative history demonstrates that the Exception was designed to accomplish a well-identified purpose—to enable derivative works to continue to be accessible to the public after the exercise of an author's termination rights.[45] Specifically, that history

---

cases that freelance contracts are used. *Of course, motion picture producers purchase rights to story material from book publishers who hold copyrights to novels, stories, etc.* In most of these cases, a large portion of the purchase price goes to the original author; generally a book publisher retains only the equivalent of an agent's 10 percent fee." *Id.*, at 54–55 (emphasis added).

[44] Although the Court of Appeals apparently would differentiate "creative" middlemen like book publishers and noncreative middlemen like music publishers, JUSTICE WHITE does not appear to adopt any such distinction. Under his reading of the Exception, presumably any royalties payable by a motion-picture company to a book publisher would revert to the author upon termination.

[45] They point out that even without the creation of the termination right in the 1976 Act, there had been concern about the status of certain derivative works. Moreover, they assert that under the 1909 Act, if an author alienated his renewal-term copyright, but died before his renewal term vested, the author's transfer of his renewal rights was a nullity because the right in the renewal term was exercisable only by the author's statutory successors. Thus, according to respondents, the original-term transferee who had made a derivative work could be enjoined from continuing to use

discloses a concern about the status of a number of motion-picture films that had been prepared pursuant to grants by book publishers.   Without the Exception, the reversion that an author's termination effected would have given the author the power to prevent further utilization of the motion-picture films, or possibly to demand royalties that the film producers were unwilling to pay.   Because the specific problem that the Exception addressed involved a potential confrontation between derivative-works utilizers and authors who had recaptured their copyrights, respondents argue that Congress must have intended its response to the problem to affect only those two interests.

The argument is unpersuasive.   It explains why the Exception protects the utilizer of a derivative work from being required to pay an increased royalty to the author.   It provides no support, however, for the proposition that Congress expected the author to be able to collect an increased royalty for the use of a derivative work.   On the contrary, this history is entirely consistent with the view that the terms of the grant that were applicable to the use of derivative works at the time of termination should remain in effect. The public interest in preserving the status quo with respect to derivative works is equally well served by either petitioner's or respondents' reading of the Exception.   Respondents' argument thus sheds no light on the meaning of the phrase

---

the derivative work because it might infringe the underlying copyright in the renewal term.   Some observers apparently believed that the Court of Appeals for the Second Circuit acknowledged support for this view in *G. Ricordi & Co.* v. *Paramount Pictures, Inc.*, 189 F. 2d 469, 471, cert. denied, 342 U. S. 849 (1951), when it wrote that "[a] copyright renewal creates a new estate, and the few cases which have dealt with the subject assert that the new estate is clear of all rights, interests or licenses granted under the original copyright."   Therefore, respondents reason that there was confusion after *Ricordi* regarding whether the law allowed a derivative-work owner to utilize the work after the expiration of the underlying copyright or whether the law prohibited all utilization of the derivative work.

"the terms of the grant." Surely it does not justify the replacement of contractual terms that unambiguously require payment of royalties to a publisher with a new provision directing payment to an author instead.

Under the terms of the grant in effect at the time of termination, Mills is entitled to a share of the royalty income in dispute.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE WHITE, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE BLACKMUN join, dissenting.

I can accept the assertion that the "terminated grant" referred to in § 304(c)(6)(A) is the original grant from Snyder to Mills. I also have no trouble with the notion that the derivative works at issue in this case were prepared "under authority of the grant," in that the Snyder-Mills grant endowed Mills, as owner of the copyright, with the authority to license the preparation of sound recordings of the Song. And it is merely an obvious rephrasing of the statutory language to say that users of these derivative works may continue to utilize them under the specific terms of the licenses issued by Mills. But these observations provide no basis for construing the statute so as to extend the benefits of the Exception to Mills, as well as to users of derivative works, after the Snyders have terminated the original grant and reclaimed ownership of the copyright.

## I

The right to terminate defined in § 304(c) encompasses not only termination of the grant of copyright itself, but also termination of the grant of "any right under" that copyright. Subsection (6) of this provision reiterates this point, stating that "all of a particular author's rights under this title that were covered by the terminated grant revert, upon the effective date of termination," to the author or his heirs. A

straightforward reading of this language is that it allows the author or his heirs to reclaim the copyright he formerly bargained away, as well as any other right granted under the copyright. Surely this termination right extends to recapturing the right previously given to the grantee, in this case Mills, to share in royalties paid by licensees.

The author's right to displace the grantee under § 304(c)(6) appears complete, subject only to the enumerated exceptions. One of these, Exception (A), accords the utilizer of a derivative work the privilege of continuing to utilize the work under the terms of the grant. In this case, only the recording companies—not Mills—can exercise the right to utilize the derivative works.[1] To protect that utilization, it is necessary only to insulate utilizers from the author's right to terminate the license of the underlying work and to renegotiate a higher royalty. The utilizers' sole interest is in maintaining the royalty rate that prevailed before the author's termination of the grant; the identity of the party who receives that royalty is a matter of indifference to them. In this case, the utilizers, Mills' licensees, were not parties to the agreement between Mills and Snyder. They were contractually obligated to pay royalties to Mills, but were not involved in any division of royalties beyond that point. It is strange, to say the least, to hold, as the Court does today, that the terms of utilization by the licensee include the agreement between Mills and Snyder to divide royalties, an agreement that is entirely irrelevant to protecting utilization of the derivative work.

The majority attempts to resolve the tension between the three uses of the word "grant" in § 304(c)(6)(A) by reading the word to encompass both the Snyder-Mills grant and Mills'

---

[1] As the Court of Appeals observed, if Mills did attempt to utilize any of the derivative works, for example by selling copies of the phonorecords of the copyrighted work to the public, it would be infringing on the derivative copyrights. *Harry Fox Agency, Inc.* v. *Mills Music, Inc.*, 720 F. 2d 733, 739 (CA2 1983).

subsequent licenses to the record companies. But while this interpretation may stretch the language of the Exception to fit the situation at hand, it does not explain why the Exception should preserve the royalty-division agreement between Mills and Snyder. Even assuming that there is only one grant, and that it includes the licenses issued by Mills, the only terms of the grant preserved by the Exception are those terms under which the derivative grant is utilized. The relevant terms, therefore, are those governing the licensees' obligation to pay a certain royalty rate, not those governing the division of royalties between Mills and the Snyders.

The majority claims that it is essential to read the Exception as preserving Mills' rights because the terms under which the derivative works are utilized identify Mills, or Fox, as Mills' agent, as the recipient of the royalties. It is surely true that the licenses say this, but that is a surprisingly weak reed on which to rest a judgment of this Court. It can mean only that, if the utilizer of the derivative work wishes to continue to pay royalties to Fox, he may do so. Fox, after collecting the royalties and deducting its fee, will be obligated to forward the royalties to the rightful owners of the copyright, the Snyders.[2]

## II

The majority's reading of the statute, as awkward and clumsy as it is, might conceivably be accepted if it were supported by the legislative history. But it plainly is not. The legislative history of the Exception is scanty, and it contains

---

[2] The majority finds perpetuation of the royalty-division agreement essential to *the Snyders'* right to collect derivative-works royalties, because, according to the majority, absent that agreement the Snyders have no contractual or statutory right to receive them. This argument assumes that the Exception deprives the Snyders of the right to receive royalties, a right that they would otherwise reclaim by virtue of the termination provisions of § 304(c). But the Exception deprives the Snyders only of the right to change the rate of royalties, not of the right to receive them. See *supra*, at 179 and this page..

no express consideration of the multiple-grant situation that confronts us in this case. Rather, Congress confined its attention to the situation involving a grant from the copyright owner to the creator of an independently copyrightable derivative work. A 1967 House of Representatives Report, for example, discussing an earlier version of the 1976 Copyright Act, stated that "any grantee who has made a derivative work under *his* grant" might continue to use the work after termination of the grant.[3] The Committee apparently assumed that the grantee of the underlying copyright and the utilizer of the derivative work would be one and the same.

The majority places great emphasis on indications that Congress was aware of multiparty arrangements in the movie and music-publishing industries, positing from this awareness an intention to extend the benefits of the Exception to middlemen such as Mills. But the majority cites not one word to indicate that Congress did in fact contemplate such a result when it enacted the Exception. On the contrary, when the Exception was being drafted by the Copyright Office, the hypotheticals offered to illustrate its operation were cast in terms of the motion picture industry and assumed that the creator of the underlying work, a story or novel, would deal directly with the creator of the derivative work, a film.[4] If, as the majority asserts, Congress did consider the application of the Exception to the multiple-grant situation, it is indeed odd that it phrased the statutory language so ambiguously.

---

[3] H. R. Rep. No. 83, 90th Cong., 1st Sess., 9 (1967) (discussing right of first negotiation granted to current holder of derivative rights under then-current proposal) (emphasis added).

[4] See Discussion and Comments on Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law, 88th Cong., 1st Sess., Copyright Law Revision, Part 2, p. 361 (H. Judiciary Comm. Print 1963) (Statement of Motion Picture Association of America); Supplementary Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law: 1965 Revision Bill, 89th Cong., 1st Sess., Copyright Law Revision, Part 6, p. 76 (H. Judiciary Comm. Print 1965).

That middlemen such as music publishers were to be excluded from the benefits conferred by the Exception is strongly supported by statements to that effect by music publishers themselves, made in the discussions that took place before the Copyright Office. When a version of the Exception first appeared in the 1964 preliminary draft bill, representatives of the music publishing industry protested. A representative of the Music Publishers Association of the United States stated that under the proposed exception, "the royalties resulting from the license presumably rever[t] entirely to the author."[5] A spokesman for the Music Publishers Protective Association construed the Exception as being "for the benefit of everyone acquiring rights under a copyright other than the publisher."[6]

---

[5] Preliminary Draft for Revised U. S. Copyright Law and Discussions and Comments on the Draft, 88th Cong., 2d Sess., Copyright Law Revision, Part 3, pp. 284–285 (H. Judiciary Comm. Print 1964) (statement of Phillip Wattenberg). See also *id.*, at 296–297 (termination clause, including exception, would give author 100% of royalties) (statement of Mr. Kaminstein).

[6] *Id.*, at 318–319 (written submission of Julian Abeles). These statements were, of course, made by interested parties. But this Court has recognized that, where, as here, legislation is the result of compromise between competing interests, see H. R. Rep. No. 83, *supra*, at 90, statements by interested parties carry some weight. See *Dawson Chemical Co.* v. *Rohm & Haas Co.*, 448 U. S. 176, 202–212 (1980); *Chicago & N. W. R. Co.* v. *Transportation Union*, 402 U. S. 570, 576 (1971). In those cases, the testimony was given before Congress itself, whereas the music publishers' statements were made to the Copyright Office. But the Copyright Act is unusual in that much of it, including the derivative-works Exception, was drafted by the Copyright Office, which is itself an arm of Congress. The House and Senate Committees were clearly aware of the history of the termination provisions in the Copyright Office. See H. R. Rep. No. 83, *supra*, at 90; Hearings on S. 1006 before the Subcommittee on Patents, Trademarks, and Copyrights of the Senate Committee on the Judiciary, 89th Cong., 1st Sess., 64 (1965). Especially in the absence of any other legislative history directly relevant to the treatment of music publishers under the Exception, the statements before the Copyright Office cannot be ignored.

The legislative history thus lends no support for Mills' claimed right to share in the royalties from derivative works. Rather, it clearly evidences the underlying purpose of the Exception, which is, as the majority concedes, to protect the actual owners of derivative works, such as film producers, from having to renegotiate rights in underlying works, such as the novels or plays on which the films were based. When the Exception was formulated, and indeed when it was enacted, the prevailing understanding of the 1909 Act was that the owners of renewal rights in a copyrighted work might exercise a veto power over continued performance of a derivative work that had been created under a first-term grant.[7] Motion picture studios, fearing infringement actions by authors' statutory successors or their assignees, removed from circulation several highly successful films.[8] The Exception

---

[7] This was the "broad interpretation" of *G. Ricordi & Co.* v. *Paramount Pictures, Inc.*, 189 F. 2d 469 (CA2), cert. denied, 342 U. S. 849 (1951). *Ricordi* merely held that the licensee of a copyright holder may not prepare a new derivative work based upon the copyrighted work after termination of the grant. Some courts and commentators, however, extracted from *Ricordi* a rule that even continued utilization of a previously created derivative work must cease after termination of the grant in the underlying work. See Bricker, Renewal and Extension of Copyright, 29 S. Cal. L. Rev. 23, 43 (1955); Melniker & Melniker, Termination of Transfers and Licenses Under the New Copyright Law, 22 N. Y. L. S. L. Rev. 589, 612, n. 117 (1977). Barbara Ringer, former Register of Copyrights, endorsed this view in a study prepared for Congress in connection with the drafting of the 1976 Act. B. Ringer, Renewal of Copyright, 86th Cong., 2d Sess., Copyright Law Revision, Studies Prepared for the Subcommittee on Patents, Trademarks, and Copyrights of the Senate Committee on the Judiciary, Study No. 31, p. 169 (Comm. Print 1961). A narrower interpretation eventually prevailed, but not until after passage of the 1976 Act. See *Rohauer* v. *Killiam Shows, Inc.*, 551 F. 2d 484 (CA2), cert. denied, 431 U. S. 949 (1977).

[8] These included "Thanks for the Memory," "You Can't Take It With You," and "The Man Who Came to Dinner." Others, like "Gone With the Wind," remained in circulation only because producers were willing to pay substantial sums to holders of copyrights in the underlying works. See Jaszi, When Works Collide: Derivative Motion Pictures, Underlying

was drafted in response to protests from commentators and movie producers whose goal was to allow the continued distribution of movies despite termination of the grant in the underlying play or novel.[9]   Barbara Ringer, then Assistant Register of Copyrights, described an early version of the Exception as being designed to "permit the owner of a derivative work, such as a motion picture, to continue using it."[10] The House Report on the 1976 Act also offered this explanation in elucidating the Exception: "In other words, a film made from a play could continue to be licensed for performance after the motion picture contract had been terminated but any remake rights covered by the contract would be cut off."[11]

To carry out this purpose of protecting derivative users, it is unnecessary to protect middlemen as well, and there is no indication whatsoever that Congress intended to do so.   The majority, however, unaccountably rejects the position that

Rights, and the Public Interest, 28 UCLA L. Rev. 715, 740 (1981).   If an author had assigned his rights in the renewal term at the time that he assigned rights in the initial term, a grantee might safely release a derivative work prepared under authority of the first-term grant.   But if the author had died before his renewal rights vested, his statutory successors acquired those rights, and any previous assignment was rendered null. See *Miller Music Corp.* v. *Charles N. Daniels, Inc.*, 362 U. S. 373 (1960). Movies based on plays or novels were therefore taken out of circulation when authors had died before their renewal rights had vested, and statutory successors or their assignees had renewed the copyright in the underlying work.   Note, Derivative Copyright and the 1909 Act—New Clarity or Confusion?, 44 Brooklyn L. Rev. 905, 928, n. 125 (1978).

[9] See Discussion and Comments on Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law, *supra* n. 4, at 361 (submission of Motion Picture Association of America); *id.*, at 265 (statement of Seymour Bricker); Preliminary Draft for Revised U. S. Copyright Law and Discussions and Comments on the Draft, *supra* n. 5, at 16, § 16(b) Alternative A; *id.*, at 21, § 22(c)(3) (insertion of derivative-works exception for new and existing copyrights in 1964 Preliminary Draft).

[10] *Id.*, at 278.

[11] H. R. Rep. No. 94–1476, p. 127 (1976) (discussing 17 U. S. C. § 203(b), the analogue to § 304 for new copyrights).

the Exception should be construed only so broadly as is necessary to effectuate this undisputed legislative intent.[12]   It also ignores the accepted principle of statutory construction that an ambiguous statute should be construed in light of the statutory purpose.[13]   As the majority acknowledges, the principal purpose of the extension of the term of copyright and the concomitant termination provisions—to which the derivative-works clause forms an exception—was to benefit authors.   Under the 1909 Copyright Act, copyright subsisted in two 28-year terms, with renewal available to the author at the end of the first term.   This right of renewal was intended to allow an author who had underestimated the value of his creation at the outset to reap some of the rewards of its eventual success.[14]   That purpose, however, was substantially thwarted by this Court's decision in *Fred Fisher Music Co.* v. *M. Witmark & Sons*, 318 U. S. 643 (1943).   As a result of that decision, an author might assign, not only the initial term of the copyright in his work, but also the renewal

---

[12] The majority's thesis ignores the principle that "where there is doubt about how inclusively a statute should be construed to apply, if the mischief that it was enacted to remedy can be perceived it will be construed to apply only so far as is needed in order to effectuate the remedy." 2A C. Sands, Sutherland on Statutory Construction § 54.04, p. 358 (4th ed. 1973).

As construed by the majority, the derivative-works Exception also creates a statutory inconsistency with the compulsory license mechanism established under 17 U. S. C. § 115.   Section 115 allows record producers to make and sell sound recordings without permission from the copyright owner, provided that they pay a statutory royalty.   This royalty is payable to the current owner of the copyright.   § 115(c)(1).   In this case, as all agree, the current owners of the copyright are the Snyders.

[13] See *Sony Corp.* v. *Universal City Studios, Inc.*, 464 U. S. 417, 431–432 (1984); see also *United States* v. *Bacto-Unidisk*, 394 U. S. 784, 799 (1969) ("[W]here the statute's language seem[s] insufficiently precise, the 'natural way' to draw the line 'is in light of the statutory purpose' ") (quoting *SEC* v. *Ralston Purina Co.*, 346 U. S. 119, 124–125 (1953)).

[14] See Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law, 87th Cong., 1st Sess., Copyright Law Revision, 53 (H. Judiciary Comm. Print 1961).

term. Thus, assignees were able to demand the assignment of both terms at the time when the value of the copyrighted work was most uncertain.

The termination provisions of the 1976 Act were designed to correct this situation. They guarantee to an author or his heirs the right to terminate a grant and any right under it "notwithstanding any agreement to the contrary." [15] The House Report accompanying the Act explained that "[a] provision of this sort is needed because of the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited." [16] The termination provisions, therefore, clearly favor authors' interests over those of grantees such as music publishers. [17]

The derivative-works clause reflects an accommodation between two competing concerns: that of providing compensation to authors, and that of promoting public access to derivative works. The majority apparently concludes that its interpretation of the Exception does justice to both of these concerns. But to promote public access to existing derivative works, it is necessary to go no further than to allow the owners of these works to continue to disseminate them. The rights of middlemen to receive royalties under terminated grants do not enter into the balance; regardless of

---

[15] 17 U. S. C. § 203(a)(5) (grants executed on or after effective date of Act); § 304(c)(5) (grants executed before effective date of Act). In place of the renewal-term system of the 1909 Act, the 1976 Act substitutes a single term enduring for the life of the author plus 50 years. § 302(a). In the case of subsisting copyrights, the Act extended the term of copyright from 56 years to 75. §§ 304 (a),(b).

[16] H. R. Rep. No. 94–1476, at 124.

[17] Barbara Ringer, former Register of Copyrights and the person who was most instrumental in the drafting of the 1976 Act, see 1 M. Nimmer, The Law of Copyright, Preface to the 1978 Comprehensive Treatise Revision vi, has written that the Act as a whole, including the termination provisions, "mark[s] a break with a two-hundred-year-old tradition that has identified copyright more closely with the publisher than with the author." Ringer, First Thoughts on the Copyright Act of 1976, 22 N. Y. L. S. L. Rev. 477, 490–493 (1977).

who receives the royalties, the owner of the derivative work may continue to pay the same rate, and public access to the work will be unimpeded.

By going further than necessary to effect the goal of promoting access to the arts, the majority frustrates the congressional purpose of compensating authors who, when their works were in their infancy, struck unremunerative bargains. That such frustration will result is clearest in the situation, not uncommon in the music industry, where an author has assigned his rights for a one-time, lump-sum payment.[18] Under the majority's interpretation of the Exception, the publisher-middleman would be free to continue to collect all royalties accruing during the extended 19-year copyright term, and the author would receive nothing. While my interpretation of the Exception results in the author's receiving more than he would have received under the terminated grant, such a result is the very objective of the termination provisions.

To allow authors to recover the full amount of derivative-works royalties under the Exception is not to slight the role of middlemen such as music publishers in promoting public access to the arts. Achieving that fundamental objective of the copyright laws requires providing incentives both to the creation of works of art and to their dissemination.[19] But the need to provide incentives is inapposite to the circumstances of this case, because the rights at issue are attached to a term of copyright that extends beyond what was contemplated by the parties at the time of the initial grant. In 1940, when Ted Snyder and Mills entered into their royalty-division

---

[18] These lump-sum transfers were a major target of the Act's termination provisions. See Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law, 87th Cong., 1st Sess., Copyright Law Revision, 58 (H. Judiciary Comm. Print 1961) (proposing that rights revert to author only when author "would otherwise receive no benefit from the lengthened term," as a result of lump-sum transfer).

[19] See *Twentieth Century Music Corp.* v. *Aiken*, 422 U. S. 151, 156 (1975).

agreement, neither party could have acted in reliance on the royalties to be derived from the additional 19-year term created by the 1976 Act. In this situation, the author and the grantee have each already reaped the benefit of their bargain, and the only question is which one should receive the windfall conferred by Congress. The considerations that should govern the allocation of a windfall are not those of providing incentives but those of providing compensation. And the legislative history of the renewal and termination provisions indicates a congressional purpose to compensate authors, not their grantees. In attempting to claim for itself the benefits of the derivative-works exception, Mills bears the burden of proof.[20] In my view, it has fallen far short of carrying that burden.

---

[20] Under general principles of statutory construction, "[o]ne who claims the benefit of an exception from the prohibition of a statute has the burden of proving that his claim comes within the exception." 2A C. Sands, Sutherland on Statutory Construction § 47.11, p. 90 (4th ed. 1973); see *United States* v. *First City National Bank of Houston*, 386 U. S. 361, 366 (1967).